# United States Court of Appeals
## For the First Circuit

————————————

No. 07-1635

PETRA B. SOMPOTAN and JANSEN A. KOLOAY,

Petitioners,

v.

MICHAEL B. MUKASEY,
Attorney General of the United States,

Respondent.

————————————

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OR IMMIGRATION APPEALS

————————————

Before

Torruella, Circuit Judge,
Cudahy,[*] Senior Circuit Judge,
and Lipez, Circuit Judge.

————————————

William A. Hahn on brief for the petitioner.
Jeffrey S. Bucholtz, Acting Assistant Attorney General, Terri J. Scadron and Anthony Wray Norwood on brief for the respondent.

————————————

July 16, 2008

————————————

[*]Of the Seventh Circuit, sitting by designation.

**CUDAHY, <u>Senior Circuit Judge</u>**.  Petitioners Petra B. Sompotan and Jansen A. Koloay, natives and citizens of Indonesia, appeal from a final order of the Board of Immigration Appeals (the Board) denying their applications for asylum, withholding of removal and protection under the Convention Against Torture (the Convention). The immigration judge (IJ) found that the petitioners had failed to establish that the mistreatment they suffered was "on account of" their race or religion; the IJ also found that much of the mistreatment did not amount to "persecution."  In a brief order, the Board affirmed.  The petitioners then filed this petition for review, claiming that the IJ and the Board committed a legal error in failing to conduct a "mixed motives analysis."  As we shall explain, this argument is without merit.

## I.

Sompotan and Koloay are, as we have said, natives of Indonesia.  They are both Christians, and Sompotan is also ethnic Chinese.  Sompotan and Koloay entered the United States at St. Paul, Minnesota on September 18, 2001 as non-immigrant tourists with authorization to remain within the country for one month. Sompotan applied for asylum on February 3, 2003, listing Koloay as a beneficiary.[1]  The Department of Homeland Security issued them

---

[1]As Sompotan's spouse, Koloay would be eligible for asylum or withholding of removal if Sompotan qualified. <u>See</u> 8 U.S.C. § 1158(b)(3)(A).

both a Notice to Appear on June 26, 2003, charging them with overstaying their non-immigrant visas.

The removal hearing was held on April 4, 2005; both Sompotan and Koloay testified. In December 1997, they operated a restaurant in Jakarta. One day, Sompotan saw men approaching the restaurant. The men approached her husband and demanded cigarettes and money. When Koloay refused, they hit him over the head with a stick. Sompotan fled the restaurant and waited by the corner, but the men approached her, knocked her to the ground, and took her necklace and watch, while saying "crazy Christian" and "Chinese bastard."

Petitioners testified that during the time they lived in Jakarta, they held weekly prayer groups in which about twenty-three people would sing, albeit softly. Petitioners claim that the meetings were disrupted by loud music, motorcycle noises, and shouts of "Allah Huakvar" ("God is Great") from the streets. When they looked outside to see who was causing the commotion, they saw a group of youths who wore red bandanas.

In May 1998, the petitioners were caught in the now-infamous Jakarta riots. Rioters began looting and burning a supermarket next to their restaurant, and quickly moved to their restaurant. Koloay testified that they heard the people approaching the restaurant saying "he is Chinese, he is also Chinese." Sompotan and Koloay were able to flee to safety but their restaurant was badly damaged and they never returned to it.

- 3 -

After the riots, the petitioners returned to the town of Tatelu Menado, where they opened a convenience store. Their Muslim neighbors, with whom they were on good terms, asked them for a loan. When the neighbors did not repay the loan, Sompotan went to the neighbors and told them that if they did not repay the loan, she would report them to the police. The neighbors soon gave Sompotan three fresh fish, which she cooked and consumed. After eating the fish, she passed out. The doctors at the hospital told her that she had been poisoned. The incident was reported to the police, who questioned the neighbors but did not arrest them.

The IJ found that Sompotan and Koloay were removable and denied their applications for asylum, withholding of removal and protection under the Convention. The IJ concluded that their application for asylum was untimely as it was not filed within one year of their entry into the United States, and that they had failed to establish that "extraordinary circumstances" excused the delay. In the alternative, the IJ concluded that their claims for asylum were without merit because they did not establish that they had suffered persecution "on account of" their race or religion. He also noted that many of the incidents described by the petitioners did not amount to persecution. Because they failed to satisfy the requirements for asylum, the IJ determined that they could not satisfy the more stringent standards for withholding of removal and relief under the Convention. The IJ did, however,

- 4 -

grant them voluntary departure.  The petitioners appealed to the Board, which affirmed the IJ's decision.  They then filed a petition for review in this court.

## II.

In their petition, Sompotan and Koloay abandon their claims for asylum and protection under the Convention.  The only issue before us is the Board's denial of their claims for withholding of removal.  Because the Board's decision largely affirmed and adopted the decision of the IJ, we review both decisions.  See Settenda v. Ashcroft, 377 F.3d 89, 92-93 (1st Cir. 2004).

Withholding of removal is available if "the alien's life or freedom would be threatened in [the destination] country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  A "threat to life or freedom" in a withholding case is analyzed in the same way "persecution" is analyzed in asylum cases.  Attia v. Gonzáles, 477 F.3d 21, 23 (1st Cir. 2007).  A petitioner's burden in a withholding case is, however, more stringent; petitioners must show a "clear probability" that they were or will be persecuted.  See INS v. Stevic, 467 U.S. 407, 424 (1984).  Persecution "is mistreatment that . . . extend[s] beyond harassment, unpleasantness, and basic suffering."  Id.  Further, as in asylum cases, it is "critical" that the petitioners show a "nexus" between the alleged persecution and one of the statutorily protected

grounds.  See INS v. Elias-Zacarias, 502 U.S. 478, 483, S. Ct. 812, 117 L. Ed. 2d 38 (1992).  To establish the nexus, the petitioner must present "evidence from which it is reasonable to believe that the harm was motivated by a protected ground."  See In re S-P-, 21 I. & N. Dec. 486, 490 (BIA 1996).  The end result is that, to qualify for withholding of removal, the petitioners must "demonstrate either that [they have] suffered past persecution on account of a protected ground . . . or that it is more likely than not that [they] will be persecuted on account of a protected ground if sent to the destination country."  Heng v. Gonzáles, 493 F.3d 46, 48 (1st Cir. 2007) (emphasis added).  These two methods are, of course, commonly referred to as past and future persecution.

Sompotan and Koloay's applications hinged almost entirely on evidence of past persecution.  Specifically, they emphasized four events: (1) their restaurant was robbed by a group of Muslims, who beat Koloay over the head with a stick and pushed Sompotan to the ground; (2) their restaurant was burned during the Jakarta riots of May 1998; (3) their prayer group meetings were disturbed when their Muslim neighbors deliberately made loud noises outside; and (4) Sompotan was poisoned by her Muslim neighbors after reporting them to the police for not repaying a loan.  The IJ discussed each of these incidents and concluded both that the mistreatment did not amount to persecution and that the petitioners had failed to establish that the mistreatment was motivated by ethnic or

- 6 -

religious animosity. The Board affirmed.

Whether the persecution experienced by a petitioner amounted to persecution and whether the persecution was inflicted "on account of" a protected ground are generally questions of fact. See López de Hincapie v. Gonzáles, 494 F.3d 213, 218 (1st Cir. 2007). We owe these determinations deference. See 8 U.S.C. § 1252(b)(4)(B) (specifying that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). Accordingly, "our review is aimed at determining whether the decision is supported by substantial evidence in the record." Halo v. Gonzáles, 419 F.3d 15, 18 (1st Cir.2005). "That the record supports a conclusion contrary to that reached by the [Board] is not enough to warrant upsetting the [Board]'s view of the matter; for that to occur, the record must compel the contrary conclusion." López de Hincapie, 494 F.3d at 218 (emphasis in original).

The petitioners argue, however, that we should review the decisions of the IJ and the Board de novo because they committed a legal error in failing to employ "a mixed motive analysis." See Petitioners' Br. 8-9 (citing In re S-P-, 21 I. & N. Dec. 486, 490 (BIA 1996)). We note, at the outset, that the petitioners are not very clear in explaining what they believe this "mixed motive analysis" to be. Of course, the Board's decision in In re S-P- laid out a five-factor test to be used in examining cases of "mixed

- 7 -

motive," where an ostensibly legitimate government motive is actually a pretext for impermissible motivations. In re S-P-, 21 I. & N. at 494. But one look at the test makes clear that it does not apply here.[1] Further, the cases that purport to use a "mixed-motive analysis" have generally involved investigations into the motives underlying government prosecution or punishment. See, e.g., Menghesha v. Gonzáles, 450 F.3d 142 (4th Cir. 2006) (government security agent threatened for warning students of an impending arrest); Vumi v. Gonzáles, 502 F.3d 150 (2d Cir. 2007) (Congolese woman arrested, interrogated and mistreated by the military). Those cases are of little relevance here.

Thus, the petitioners must be arguing that the IJ and the Board violated the principle, expressed in In re S-P- and

---

[1]The factors to be considered are as follows:

"1. Indications in the particular case that abuse was directed toward modifying or punishing opinion rather than conduct (e.g., statements or actions by the perpetrators or abuse out of proportion to nonpolitical ends);
2. Treatment of others in the population who might be confronted by government agents in similar circumstances;
3. Conformity to procedures for criminal prosecution or military law including developing international norms regarding the law of war;
4. The extent to which antiterrorism laws are defined and applied to suppress political opinion as well as illegal conduct (e.g., an act may broadly prohibit "disruptive" activities to permit application to peaceful as well as violent expressions of views);
5. The extent to which suspected political opponents are subjected to arbitrary arrest, detention, and abuse."

In re S-P-, 21 I. & N. Dec. at 494.

elsewhere, that a petitioner is not required to show that the impermissible motivation was the sole motivation for the persecution. See In re S-P-, 21 I. & N. Dec. at 490. Petitioners seldom know the "exact motivation[s]" of their persecutors and, of course, persecutors may often have more than one motivation. Id. Thus, a petitioner must only show that the persecution was based, "at least in part," on an impermissible motivation.[2] Sánchez Jiménez v. U.S. Attorney General, 492 F.3d 1223, 1232-33 (11th Cir. 2007). A petitioner is never precluded from proving a impermissible motive simply because some other motive has already been established. But this is not a "mode of analysis"; it is simply the proper legal standard. Compare Menghesha, 450 F.3d at 148 n.3 ("In asking us to assess his claim under a mixed-motive standard, [the petitioner] is not alleging a distinct legal claim. Rather, he is merely elucidating the proper legal standard . . .") with id. at 150 (Williams, J., dissenting) ("[T]here is 'no other kind of case' than a mixed motive case.").

There is no reason to believe that the IJ and the Board misunderstood this legal principle. The IJ never stated that the petitioners were required to show that ethnic or religious

---

[2]The REAL ID Act of 2005 amended the INA to require that an applicant show that a protected ground was a "central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(I). See REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., 119 Stat. 231 (May 11, 2005). This requirement is only applicable to applications filed on or after May 11, 2005.

animosity was the sole motivation for the alleged persecution; nor did the IJ prematurely terminate the analysis upon the finding of another motive. The IJ simply found that the sole motivations for the alleged persecution were motivations that are not impermissible under the statute. The fact that an actor may have multiple motives does not alter the petitioner's burden to "provide sufficient evidence to forge an actual connection between the harm and some statutorily protected ground." See López de Hincapie, 494 F.3d at 218. The IJ properly found that this connection had not been forged on this evidence.

## III.

Now that we have clarified the petitioners' burden in this case, we turn to the central issue: whether the IJ's finding that the petitioners' had not forged an actual connection between the mistreatment they suffered and a statutorily protected ground is supported by substantial evidence. To establish the nexus, the petitioner must present "evidence from which it is reasonable to believe that the harm was motivated [in part] by a protected ground." In re S-P-, 21 I. & N. Dec. at 490. Sompotan argues that there was "ample" evidence supporting the fact that the harm they suffered was "on account of" their religious affiliation and

ethnicity.[3]

We begin with the robbery of the petitioners' restaurant. The IJ characterized the incident at the restaurant as a robbery and concluded that there did not appear to be any other motivation behind the crime. A.R. 60. Indeed, almost all of the evidence points in this direction. The hooligans entered the restaurant asking for cigarettes; they quickly demanded money and, when their demands were not met, they beat Koloay with a stick. On their way out, they pushed Sompotan to the ground, snatching her necklace and watch. The only evidence that the petitioners offered to show that they had been targeted because of their race or religion was that the assailants yelled, "Chinese bastard, crazy Christian, crazy Chinese." A.R. 112. But the fact that the assailants made racial slurs while committing a crimes does not, on this record, prove that ethnic or religious hostility was the <u>motivation</u> for the attacks. <u>See</u> <u>Ming Ming Wijono</u> v. <u>Gonzáles</u>, 439 F.3d 868, 873 (8th Cir. 2006); <u>Lie</u> v. <u>Ashcroft</u>, 396 F.3d 530, 535 (3d Cir. 2005). The fact that hooligans would stoop to the level of using racial slurs is, unfortunately, not surprising.

We turn to the Jakarta riots and, here, we must express partial disagreement with the IJ. The IJ found that the

---

[3]In their brief, the petitioners suggest that, because they were found to be credible witnesses, the IJ was obligated to accept their <u>conclusion</u> that the persecution was "on account of" ethnic or religious hostility. The petitioners, however, must present <u>facts</u> from which this inference can be drawn.

petitioners were simply in the path of a "huge, spontaneous act of violence," where violence became a cause in itself.  A.R. 58. We think this conclusion flies in the face of both the petitioners' testimony and the many documentary materials presented to the IJ. It is well known that rioters had targeted this area of shops because it was owned by ethnic Chinese.  That the petitioners' restaurant was burned in a fire started in the supermarket next store is irrelevant: the whole area of shops had been targeted. The IJ's conclusion that the restaurant burning was not motivated on protected grounds is not supported by substantial evidence. This error, however, was harmless.  The IJ also noted that neither Sompotan or Koloay were physically harmed at the time.  While this factual finding is not determinative, see, e.g., Sok v. Mukasey, 526 F.3d 48, 54-55 (1st Cir. 2008), "the presence or absence of physical harm (and, indeed, the degree of harm inflicted) remains a relevant factor in determining whether mistreatment rises to the level of persecution."  Ruiz v. Mukasey, 526 F.3d 31, 37 (1st Cir. 2008).  Given the isolated nature of the arson, the petitioners' experiences do not rise to the level of persecution.  See, e.g., Kho v. Keisler, 505 F.3d 50, 57-58 (1st Cir. 2007).

We turn to the last incident in Jakarta, which involves the disturbance of the prayer group meetings.  Here again, the IJ found nexus problems.  Sompotan testified that the neighbors who made the noise were Muslims because they chanted "Allah Huakvar."  But this

sheds little light on their motivations. The prayer groups did consist of twenty-three people singing, and the neighbors could have been annoyed by the sounds. The way they responded – by shouting, turning up their music, and revving motorcycles — suggests that this may have been the case. We cannot say on this record that the IJ's finding was not supported by substantial evidence. See Ming Ming Wijono, 439 F.3d at 873; Lie, 396 F.3d at 535. Further, the IJ also noted that the prayer group had continued to meet despite the interruptions. This strongly suggests that the disturbances did not rise to the level of persecution in any case. See Bocova v. Gonzáles, 412 F.3d 257, 263 (1st Cir. 2005).

Finally, we come to the incident in which Sompotan was poisoned. All of the evidence points to the conclusion that this unfortunate incident was the result of a personal grudge. Indeed, the petitioners' own testimony bears this out. Sompotan herself testified that they originally got along with the neighbors. Indeed, Sompotan stated that the loan was the root cause of the problems.[4] Sompotan testified at the removal hearing that she

---

[4]Sompotan testified as follows: "In the beginning everything [in Tatelu Menado] went really smoothly. In fact, a family near our store was very, very kind to us. We were friends. Then one day they borrowed money from me." A.R. 140. On her I-589 form, Sompotan explained: "My husband did not agree with me on lending them some money, for fear that it might turn out to be a reason for hatred when she is unable to repay us. It really changed from assumption to a reality. They refuse to repay me and to make the worse thing worst they became bitter enemy of mine . . .." A.R.

believed that the neighbors had poisoned her because they were angry that she had turned them in to the police.[5] Events that stem from personal disputes are generally not enough to show the required nexus. Romilus v. Ashcroft, 385 F.3d 1, 6 (1st Cir. 2004); DaSilva v. Ashcroft, 394 F.3d 1, 6-7 (1st Cir. 2005). The only real evidence Sompotan has that the poisoning was ethnically motivated was the fact that the neighbors' children cursed them as "bad Chinese." A.R. 118, 454. But the children's taunts are not probative of the parents' intentions. Again, the racial slur must suggest a prohibited motivation. See Ming Ming Wijono, 439 F.3d at 873; Lie, 396 F.3d at 535.

The IJ's conclusion that the poisoning and the prayer group disturbances were the result of personal disputes or grudges is

437.

[5]This was Sompotan's own explanation for the event:

> Q: [Y]ou stated that he tried to poison you because you reported him to the police because he didn't want to return the money that he had borrowed from you, isn't that correct?
> A: Yes.
> Q: Okay. So, his motivation for allegedly trying to poison you, you believed to be because he was angry with you for reporting to the police, correct?
> A: Yes.

A.R. 140. Koloay's testimony was very similar:

> Q: [D]o you have any idea why the neighbor would try to poison your wife?
> A: Because they did not want to return the money that, our money, did not want to return our money.

A.R. 165.

supported by substantial evidence.  So, too, is the conclusion that the robbery was motivated only by criminal intent.  The petitioners' experiences in the riots, while motivated by protected grounds, are not enough to sustain a finding of persecution.  Their claim for withholding must therefore fail.  We have considered the petitioner's other arguments and they are without merit.

## IV.

For the foregoing reasons, the petition of review is DENIED.