# United States Court of Appeals
## For the First Circuit

No. 08-2464

NOEMI CAAL-TIUL,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Selya, and Howard,
Circuit Judges.

Lidia M. Sanchez on brief for petitioner.
Katharine E. Clark, Department of Justice, Civil Division, Office of Immigration Litigation, Tony West, Assistant Attorney General, Civil Division, and Barry J. Pettinato, Assistant Director, on brief for respondent.

September 10, 2009

**Per Curiam.**    Noemi Caal-Tiul petitions this court for review of the decision of the Board of Immigration Appeals ("BIA") reversing the Immigration Judge's ("IJ") decision granting asylum to her.    The IJ's ground was that she had established a well-founded fear of future persecution based upon her membership in a particular social group (indigenous women).    Caal-Tiul argues that the BIA erroneously applied a de novo standard of review and that the IJ's determination must be upheld under the "clearly erroneous" standard of review.

The background events are as follows.    In March 2006, petitioner was charged with being "an alien present in the United States who has not been admitted or paroled."    She admitted to being a citizen and native of Guatemala and having entered the United States in December 2005, without a valid immigrant visa or other approval.    She submitted an asylum application and testified at a hearing before the IJ on May 11, 2007.

Pertinently, as described by the IJ, Caal-Tiul testified that in March 2005, while she and her children were living in Montebaun, Guatemala, "a gang . . . began approaching her daughter and asking her to join them.    It is not clear whether there was a demand made that the daughter join the gang, or whether there was a demand made that she agree to date one of the members of the gang.    But she was threatened thereafter and harassed."

Caal-Tiul testified that "[s]he was aware that individuals from this gang . . . had killed two people in the basketball court where her daughter spent some time," and that it was "part of the general practice of the gang in her area, that they would pressure young girls to join them in order to do bad acts and join them in doing bad acts." Caal-Tiul testified that "she did not report this harassment or threats to the police because they would not be able to do anything about it."

As a result of the threats and harassment from the gang members, Caal-Tiul "sent her children to the United States in September 2005." She continued to live at the family home in Montebaun for a few days, during which time she was approached by the gang member who had sought to associate with her daughter; he "told her that her daughter had left, but that she remained, and that he demanded that she give them money, a fine, as it were, of $50. She indicated that they used very vulgar words and that she was afraid."

Caal-Tiul then went to stay with her sister in the small village of Esplanada, about two hours from Montebaun. She stayed with her sister for approximately two months. After about one month, Caal-Tiul received a phone call at her sister's house in which "words were spoken to the effect that, 'we know where you are, there are a lot of us, don't try to hide.'" She testified that "she believes that it was the same gang that had previously

caused her and her family problems in Montebaun . . . ." Caal-Tiul decided to leave after receiving that phone call.

The IJ found that Caal-Tiul had "testified candidly and truthfully;" that Caal-Tiul had "sent her two young children to the United States [from Guatemala] to reside with their father because of threats that her daughter, then 12 years old, had received from gang members in her town;" that her children, who were 13 and 7 when Caal-Tiul entered the United States, became United States citizens through their father's naturalization; and that Caal-Tiul took up residence in the city where the children were living with their father but did not live with the father.

As to persecution, the IJ referred to State Department Country Reports which reported that among Guatemala's "societal problems" were "violence against women" and "ethnic discrimination." The IJ noted that the report also stated that "'[s]ocietal violence occurred widely throughout the country.'" Non-state actors, including some with links to gangs, generally committed the acts but "[t]he reports also suggested that former or current members of the police condoned or were involved in some of the attacks or other killings." The IJ also noted evidence from the Country Report sources and elsewhere that discrimination existed against indigenous people in the country.

Ultimately the IJ found that Caal-Tiul's fears were "objectively reasonable, given the atrocious conditions that exist

-4-

in Guatemala, the extent of gang-related violence and the government's inability to control the gang-related violence;" that Caal-Tiul was "a member of a class, which is disproportionately affected by gang violence, which is indigenous women;" and that Caal-Tiul "is a member of a targeted group, that is, indigenous women." The IJ also found that "requiring [Caal-Tiul] to remain in Guatemala, as a dependent upon her family members, unable to find true safety, unable to have a full and complete life, and to live apart from her children, is inherently unreasonable."

On review, the BIA disagreed with the IJ's conclusion that Caal-Tiul had demonstrated a well-founded fear of persecution on account of a protected ground. Specifically, it found that "the respondent has simply failed to demonstrate the problems she might face there are on account of [a] ground protected under the Immigration and Nationality Act." The BIA explained its reasoning as follows:

> Here it appears the respondent and her daughter were subjected to criminal acts carried out by gang members. Although the Immigration Judge noted that indigenous women in Guatemala are disproportionately affected by the criminal gangs in Guatemala, it does not appear from the record that the problems the respondent faced, or might face in the future, were on account of such classification nor did they argue that such was the case. In fact, the indigenous status of the respondent was not mentioned until the Immigration Judge asked about it at the very end of the hearing. Rather it appears that the threats and harassment they received were part of the ongoing criminal problems and general unrest

-5-

in that country. An asylum applicant's expression of a fear of harm resulting from general conditions of violence and civil unrest in a home country, however compelling, does not constitute the demonstration of a well-founded fear of persecution within the meaning of the Act. While the respondent might also be arguing that she and her daughter faced problems on account of their membership in a particular social group, we note that since the time of the Immigration Judge's decision, we have held that "persons resistant to gang membership" do not constitute a particular social group. Matter of E-A-G-, 24 I&N Dec. 591 (BIA 2008); Matter of S-E-G-, 24 I&N Dec. 579 (BIA 2008). And, to the extent the Immigration Judge cites the problems with domestic abuse in Guatemala, with the exception of the implications this has for the treatment of women in general, this is not germane to the case at hand.

Caal-Tiul now seeks review of the BIA decision in this court and we begin with the standard of review. In September 2002, new regulations took effect which altered the scope of the BIA's review of immigration judges' decisions. They provide, in relevant part, as follows:

> (i) The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.

> (ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo.

8 C.F.R. §1003.1(d)(3).

Central here is the IJ's finding that Caal-Tiul had not "established a well-founded fear of harm inflicted and threatened to be inflicted upon her on account of her being an indigenous female." To the extent this determination concerns petitioner's credibility and good faith belief, it is a fact finding subject only to clear error review; but to the extent the concern is whether the subjective fear is of a kind that fits within the statutory definition, it is an issue of law or law application where deference is limited or non-existent. See Rotinsulu v. Mukasey, 515 F.3d 68, 73 (1st Cir. 2008).

The Board primarily relied on the lack of evidence that the gang was motivated by Caal-Tiul's status (or that of her daughter) as an indigenous female, and to this extent review was arguably only for clear error. But the standard of BIA review makes no difference because there is no evidence that the gang was in any way motivated by the status of mother or daughter, either in making threats to the one or in making the threats to and coercion of the other.[1] The IJ cited no such evidence and nothing in the record suggests anything more than a gang preying on a girl and reacting with threats to a parent who sought to interfere.

---

[1]INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992)("the statute makes [the persecutor's] motive critical"); Sompotan v. Mukasey, 533 F.3d 63, 68 (1st Cir. 2008); In re S-P-, 21 I. & N. Dec. 486, 490 (BIA 1996).

The IJ sought to close the gap by evidence that indigenous females are more likely to be victims of private crime and violence and less likely to seek or be afforded police protection; and this would be a fair inference from knowledge of life even without Country Reports and other information. But some social, gender, economic or other groupings are almost always more vulnerable to crime and predation. This does not by itself amount to persecution--let alone by or with the acquiescence of the state--on one of the specific grounds required by the statute. See Abdille v. Ashcroft, 242 F.3d 477, 494 (3d Cir. 2001).

In this case, affirmance of the BIA is an unattractive, even though inevitable, result not because of threatened persecution on a statutory ground but because, as the IJ explained in closing, it requires Caal-Tiul "to live apart from her children . . . ." It is not clear that Caal-Tiul is likely to be much less safe in Guatemala than other women; but it is assuredly an outcome greatly to be deplored that--having chosen to send her children to the United States out of harm's way--Caal-Tiul will now be removed to another country.

The outcome is not only regrettable but probably quite unusual. The children are United States citizens because their father has become an American citizen. If he were Caal-Tiul's husband, ordinarily she would be able to join him under the customary procedures available to spouses. But in this instance it

appears that Caal-Tiul and the children's father are not married and that he is in fact married to someone else.  So, if her children remain in the United States and she is removed, she will be cut off from her children--all because of her efforts to secure safety for them.

No statutory scheme drafted for the usual case can assure complete justice in peculiar circumstances.  But the United States Citizenship and Immigration Services ("USCIS") does appear to have power to defer action when there are compelling humanitarian considerations.[2]  Occasionally injustices in deportation matters have been remedied by private bills in Congress.  Whether either of the these alternatives might work for Caal-Tiul is for her and her counsel to assess, but a request on humanitarian grounds would be far from frivolous.

The petition for review is <u>denied</u>.

---

[2]<u>See</u> <u>Reno</u> v. <u>American-Arab Anti-Discrimination Committee</u>, 525 U.S. 471, 483-84 (1999); Recommendation from the CIS Ombudsman to the Director, USCIS, Apr. 6, 2007, <u>http</u>://www.dhs.gov/xlibrary/assets/CISOmbudsman_RR_32_O_Deferred_Action_04-06-07.pdf (last visited August 28, 2009).