KAYATTA, Circuit Judge,
dissenting.
I respectfully dissent because the record does not compel us to reject the factual findings of the immigration judge. The immigration judge found that the serious abuse and harassment to which Ivanov credibly established he was subjected was not “on account of’ his religion. Rather, the immigration judge concluded, Ivanov faced persecution on account of his association with a drug rehab center that posed a threat to the skinheads’ illicit drug trade. The immigration judge also found that Iva-nov failed to establish the required nexus to government acquiescence manifest through its action or inaction. Either of these findings, unless reversed, means that Ivanov has failed to establish an entitlement to asylum. See López de Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir.2007) (“[S]howing a linkage to one of the five statutorily protected grounds [including religion] is ‘critical’ to a successful asylum claim.” (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992))); Harutyunyan v. Gonzales, 421 F.3d 64, 68 (1st Cir.2005) (“[P]ersecution always implies some connection to government action or inaction.”).
As we have previously held, the question of the persecutor’s motivation generates a “fact-specific” inquiry. López de Hincapie, 494 F.3d at 218. Similarly, the ques *17 tion of whether Ivanov established a connection between the government and his abuse is also a finding of fact. See Harutyunyan, 421 F.3d at 68. Our review of both findings is therefore limited by the “highly deferential” substantial evidence test. Larios v. Holder, 608 F.3d 105, 107 (1st Cir.2010). That test requires that we defer to the immigration judge’s findings of fact as long as those findings are “supported by reasonable, substantial, and probative evidence on the record considered as a whole.” Id. (quoting Elias-Zacarias, 502 U.S. at 481, 112 S.Ct. 812). As we observed more recently, in practical terms, the test turns on whether we are “compelled to conclude to the contrary.” Precetaj v. Holder, 649 F.3d 72, 75 (1st Cir.2011) (quoting 8 U.S.C. § 1252(b)(4)(B)).
A. There Is Substantial Evidence to Support the Finding of Fact That Ivanov Was Not Persecuted on Account of His Religion and Has Not Established a Realistic Risk of Such Persecution in the Future.
I begin by reviewing Ivanov’s testimony, which supports the factual finding that the abuse visited on (or feared by) him was not on account of his religion. I then address the arguments advanced by the majority for finding this evidence insubstantial.
1. Ivanov’s Own Testimony Directly Supports the Finding.
This is not a case in which the immigration judge stretched to draw inferences to support a conclusion in the face of direct evidence to the contrary. Instead, this is a case in which the direct evidence substantially and heavily supported the finding that Ivanov was not persecuted on account of his religion. That evidence is as follows:
The skinheads who assaulted Ivanov in 2002 and 2003 were in the illegal drug trade, while Ivanov worked at a drug rehab center that, he claims, possessed evidence of the skinheads’ illegal activity and, in any event, cut into their business. When the skinheads kidnapped Ivanov in April of 2002 they did so as he left the rehab center. They never demanded that he change his religion, or stop going to his church. To the contrary, their demands focused exclusively on the rehab center.
On direct exam, Ivanov volunteered the following explanation of why the skinheads locked him up: “they wanted me to shut down the operation of this rehab and because of that they locked me up in the basement.” On cross, Ivanov both reinforced his testimony that the skinheads wanted the drug rehab center closed because it hurt their business, and unreservedly agréed that the center’s Pentecostal affiliation was not what garnered the skinheads’ opposition:
Q: Sir, you testified that the skinheads that you say assaulted you when you were leaving the rehabilitation center wanted you to close the clinic or the center and you say in your asylum application that these skinheads had a very lucrative drug business, drug sale business and you also testified today that these skinheads were losing money because of the drug rehabilitation center. That was because the goal of the center was to try and help people get off drugs. Is that correct?
A: Yes.
Q: So they didn’t want the center shut down because it was a Pentecostal center. They wanted it shut down because they were losing drug sales, correct?
A: That is absolutely correct because these people have not a single notion about religion, but any church whether it be Protestant or Catholic it will also be on opposite side against the drugs.
*18 2. The Evidence Relied on by the Majority is Either Conjectural or, In Any Event, Insufficient to Compel Reversal.
The foregoing evidence should be enough by itself to support the decision of the immigration judge, even if the evidence to the contrary cited by the majority were as substantial as described. In fact, for the following reasons, much of that contrary evidence is based on conjecture and is otherwise reasonably viewed as not especially substantial.
The majority points to a second attack on Ivanov that occurred almost a year after the skinheads delivered their narrowly-focused demand that the rehab center be shut down. There is no evidence (much less compelling evidence) that the attack was on account of Ivanov’s religion. The majority nevertheless guesses that the attack was at the behest of the police, who had told Ivanov “days”[21] previously that he would regret not providing testimony to support charges that his pastor was hypnotizing his parishioners into tithing ten percent of their income to the Pentecostal church.
This conjecture falters on two levels. First, if conjecture is the game, then it would be equally plausible to suggest that the skinheads attacked Ivanov when they did because it was almost one year after they delivered their own unmet demand that he close the rehab center. In short, the skinheads had — and expressed — then-own reasons and there is no need to imagine that the police put them up to their crime. Additionally, even if one were to assume that the police officer and the skinheads were in cahoots, there is no reason that one must also assume that religious animus played any role in the relationship. Certainly the gains of an illicit drug trade would provide an equally if not more customary and plausible motivation. The pastor, after all, actually ran the rehab center. Ivanov himself plainly implied such a drug-centered nexus:
Pit’s a well-known and established fact that, you know, all the skinheads and similar organizations are connected to the government structure. For example, you know, our attempt to run this rehab for drug addicts, you know, was met with such resistence on their part and it’s a well-known fact also that, you know, they profit from selling drugs....
While Ivanov’s statement is not dispositive, it leans towards suggesting that money, rather than religious animus, was a common interest shared by the skinheads and the police. Certainly the immigration judge was not required to speculate to the contrary.
The majority also points to the final attack on Ivanov, the 2003 firebombing of the apartment he shared with his parents. There is nothing about this attack to compel the conclusion that it was motivated by religious animus. It actually coincided with an attack on the rehab center that same day. The rehab center and Ivanov (the person the skinheads knew worked there) were therefore again the common factor in the skinheads’ selection of targets.
This is not to say that there was no evidence at all in Ivanov’s favor. The majority notes that the skinheads once referred to the rehab center as “satanic” when they held him prisoner. But a single use of a religiously-charged word does not, on these facts, compel us to find the skinheads’ abuse of Ivanov was on account *19 of his religion. See Sompotan v. Mukasey, 533 F.3d 63, 70 (1st Cir.2008). In Sompotan we rejected the argument that the immigration judge was compelled to conclude that “hooligans” who robbed the petitioners and their restaurant yelling “Chinese bastard, crazy Christian, crazy Chinese” were motivated by religious and racial animus rather than by a desire to rob, noting that “[t]he fact that hooligans would stoop to the level of using racial slurs is, unfortunately, not surprising.” Id. at 70. Indeed, as noted above, Ivanov himself did not regard his kidnapping as religiously motivated. How then can a court say that the immigration judge was compelled to disagree?
The majority also correctly notes that there is evidence in the record of earlier attacks not limited in their apparent focus to rehab center activities and personnel. These attacks occurred in 1997 (on the congregation’s office), 1999 (on a Pentecost service at Ivanov’s pastor’s house and on Ivanov’s baptism), and 2000 (on a Pentecostal prayer house).. The majority’s view presumes that the abuse of Ivanov several years later was a refocusing of these earlier, religiously-motivated attacks directed at the church. Under this view, the skinheads attacked the rehab center because it was both a visible symbol of the church and a threat to their drug trade. This view is certainly plausible. I am at a loss, though, to see how it is so compelling that it requires rejection of the alternative view adopted by the immigration judge.
There is no evidence compelling us even to conclude that the same individuals were behind the earlier and later attacks, much less that their motivations remained constant. Indeed, there is no evidence that the “skinheads” involved in these various incidents are all part of a single group with a unified and disciplined mission and motivation.[22] As chronicled above, those individuals behind the later attacks expressly limited their demands to ending the drug rehab activity. And certainly Ivanov’s experience in dealing with those assailants persecuting him suggested that greed was their monocular focus. As we held before, where the evidence suggests a plausible motivation not within the ambit of the statute’s protection, we defer to the choice made by the immigration judge to deny asylum on that basis. See López de Hincapie v. Gonzales, 494 F.3d 213, 219 (1st Cir.2007).
The majority also relies on evidence that skinheads in Russia often possessed and acted on religious animus and that their activities often spiked on the anniversary of Hitler’s birth. But if the skinheads who kidnapped and later beat Ivanov shared that religious animus, for some unknown reason they were remarkably reluctant to voice such views to Ivanov, while nevertheless making forcefully clear their strong desire to profit from and protect their drug trade. The factual finding that the abuse here, directed at the rehab center and its worker, was motivated only by the latter desire is a type of choosing among plausible scenarios that is within the purview of the immigration judge, not a reviewing court. See Amouri v. Holder, 572 F.3d 29, 34 (1st Cir.2009) (“The mere fact that the extortionists were associated with an extremist group [did] not compel” us, on its own, to reverse a finding that petitioner’s persecution was not on account of a protected characteristic because “fanaticism and a love of money are not mutually *20 exclusive.”).[23]
The immigration judge who heard this case was hardly out to get Ivanov. He expressly found Ivanov credible in his recounting of events he had witnessed. The immigration judge was also willing to assume that the instances of abuse to which Ivanov was subjected over seven years rose to the very high level of actual persecution. Cf. Topalli v. Gonzales, 417 F.3d 128, 129-32 (1st Cir.2005) (no persecution where petitioner was arrested, detained, and beaten over the course of three years but never required medical attention and was not abused for three years before leaving the country); Bocova v. Gonzales, 412 F.3d 257, 261-63 (1st Cir.2005), superseded in unrelated part by 8 C.F.R. § 1240.26(i), as described in Garfias-Rodriguez v. Holder, 702 F.3d 504, 524 (9th Cir.2012) (two beatings twenty-five months apart, one of which caused petitioner to lose consciousness and require hospitalization, insufficient to compel a finding of persecution). The majority readily adopts the immigration judge’s assumption of persecution and his finding that Ivanov was credible in relating facts, but then proceeds to criticize the immigration judge’s reasoning simply because he also chose to believe Ivanov’s testimony that the particular people who attacked him “have not a single notion about religion,” and were instead motivated by protecting their drug trade. The immigration judge witnessed the testimony, heard Ivanov’s tone, saw his facial expressions, and concluded that the testimony I have quoted above was due great weight.
Nor can the State Department’s Country and Religious Freedom Reports perform the work assigned to them by the majority. One would think from reading the majority’s description of the reports that Pentecostals could live nowhere in Russia without facing a realistic risk of actual persecution. The majority presumably proffers such a description because the absence of such a country-wide hazard could by itself defeat Ivanov’s asylum request. Tendean v. Gonzales, 503 F.3d 8, 11 (1st Cir.2007) (asylum application will be denied “if it is shown by a preponderance of the evidence that ‘[t]he applicant could avoid future persecution by relocating to another part of the applicant’s country ... and under all the circumstances, it would be reasonable to expect the applicant to do so.’ ” (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)) (alteration in original)).
The 2006 Country Report, however, reports no acts of actual persecution of Pentecostals throughout all of Russia in the previous year. Even reports of lesser degrees of harassment of Pentecostals decreased during 2006, following the appointment of Pentecostal Bishop Sergey Ryak-hovskiy to Russia’s Public Chamber.[24] United States Department of State, Bureau of Democracy, Human Rights, and Labor, Country Report on Human Rights Practices in Russia at 20 (Mar.2007), *21 available at http://www.state.g0v/j/ dr]/ rls/hrrpt/2006/78835.htm [hereinafter 2006 Country Report ]. These reports belie the notion that Ivanov, merely because he is Pentecostal, cannot live in Russia without a risk of actual persecution.
B. There Is Sufficient Evidence to Support the Finding of Fact That There Was an Insufficient Nexus between the Russian Government and the Abuse of Ivanov.
The law also requires that Ivanov prove that the persons who persecuted him were “aligned with the government” or that the government was “unwilling or unable to control [the violence.]” Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir.2009). .The majority’s conclusion that Ivanov made such a showing is based partly on conjecture, appears to be the product of stereotypical thinking about Russian law enforcement bereft of any sense of context, and certainly fails to provide a compelling case for rejecting the contrary conclusion of the immigration judge, who found Iva-nov’s claims in this regard to rest on “speculation.”
First, the majority implies that the kidnapping of Ivanov was aided by the police merely because the kidnapping occurred some uncertain number of days after the police told him that he would be sorry for refusing to accede to a police officer’s demand that he provide incriminating testimony in an investigation of his pastor. I addressed this conjecture in Part A2 of this opinion.
Second, the majority cites excerpts from State Department reports recounting other incidents in Russia (a country of roughly 143 million people, 2006 Country Report at 1) where the authorities were, in the majority’s words, “lackluster” in their responses to reports of religious attacks and that arrests were “extremely infrequent and convictions rare.”, 2006 Country Report at 20. The majority’s use of such excerpts is selective, omitting, for example, the fact that the 2006 and 2007 Religious Freedom Reports describe in detail only a single incident, in a nation containing approximately 1,500 Pentecostal groups, 2006 Religious Freedom Report at 1, of violence against individual Pentecostals which could plausibly rise to the serious level of abuse sufficient to support an asylum claim. That incident was an attack by “youths” in early 2005 on Pentecostals holding a protest in Moscow. 2006 Country Report at 20. There is no indication in the record of whether this incident was investigated expeditiously. Id. There are no reports of individual Evangelicals, or any Christians, suffering abuse comparable to that which Ivanov described being directed at him personally, let alone evidence that government officials acquiesced to such abuse.
The same report also states that in February of 1997 Russian authorities obtained the convictions of five skinheads for an anti-Semitic murder, and that “[fjederal and regional officials participated actively in, and in many cases strongly supported, a range of government and NGO-organized programs to promote tolerance.” United States Department of State, Bureau Democracy, Human Rights, and Labor, International Religious Freedom Report for Russia at 9 (Sept.2007), available at http://www.state.gOv/j/ drl/ rls/irf/2007/90196.htm. The same report further relates that in late 2006 a Russian court ruled in favor of the Pentecostal Church’s ability to register its property, and the group reported no further harassment. Id.
Third, the majority’s heavy reliance on the fact that Ivanov was unaware of any investigations or arrests arising out of the crimes he described evidences a lack of perspective and context. Certainly the *22 failure of the police to interview Ivanov after he was released by his captors could support a finding that their investigation after the fact was lackluster. On the other hand, the actual record is that the police told Ivanov’s parents that they would look for him when his parents reported him missing. The fact that they did not find him within two days in a city of over one million people, Library of Congress, Russia: A Country Study (1998), available at http://lcweb2.loc.gov/frd/cs/rutoc.html, hardly proves anything. And the unstated assumption that Ivanov would have been aware of investigations concerning the other events he described is not compelling. All in all, this is not a record that compels a finding that the police were aligned with the people who attacked Ivanov or unwilling or unable to do their jobs.
To put all of the foregoing in perspective and provide the context missing from the majority’s discussion, one need only look at this country. According to the October 1998 Report of the National Church Arson Task Force, in less than four years there were 670 arsons, bombings or attempted bombings of houses of worship in the United States. National Church Arson Task Force, Second Year Report for the President (Oct.1998), available at http://www. justice.gov/crt/church_arson/arson98.php. Even in the wake of a nationally coordinated investigative effort, arrests were made in connection with only 230 of the 670 incidents (a higher rate than typical for similar crimes, according to the Task Force). Id.
I do not presume from these facts that churchgoers in the United States face persecution with government acquiescence. To the contrary, if Ivanov cited these facts to suggest that he could not safely live in the United States without facing persecution, I hope that we would reject such a suggestion. And when we have a record reporting no higher rates of bombing or unsolved bombings in Russia, and an unsolved incident of abuse of a drug rehab worker by drug dealers in Chelyabinsk (a city of more than 1 million people), I do not see why an immigration judge cannot find as a matter of fact that Ivanov does not face the requisite risk of government related persecution should he return to Russia.
Of course, I am now arguing the weight of the facts, which I need not do. All I need show is that the facts are not so hefty and one-sided as to compel the conclusion that they must be weighed as the majority weighs them.
C. Conclusion
At base, the majority appears to act on a conviction that if many so-called skinheads possess a strong animus against Pentecostals as manifest in prior acts of harassment and abuse, and Pentecostals operate a rehab center for religious reasons using religious methods, then any skinheads’ later abuse of operators of that center must necessarily be, at least in part, on account of the skinheads’ religious animus. I fear that such a conviction under-appreciates the complexities of human behavior, and substitutes stereotypical thinking for allegiance to the actual facts as described by Ivanov himself. Similarly, the majority fills holes in Ivanov’s case with conjecture about what the police did and did not do, all resting in part on what seems to be an unrealistic assumption about the aims and efficiency of police work in Russia. More importantly, even accepting that conviction as plausible, on this record it is not so compelling as to overbear the deference due to the amply supported findings of fact by an immigration judge who decided that Ivanov could practice his faith in Russia without persecution on account of that faith. I must therefore conclude that, not *23 withstanding our shared sympathy for Iva-nov’s desire to remain in this country, the record contains substantial enough evidence to require that we defer to the findings of the immigration judge.

. Ivanov spoke with the police officer in the “end of February” and was beaten on March 1st.

. Indeed, Ivanov described the skinheads who kidnapped him as "very young kids” and said that "some of them” were "around 16.” This suggests that they may well not have been personally involved in incidents several years before.

. Nor can the majority’s citations to country reports containing evidence that religious animus sometimes motivates persecution in Russia compel a finding that it did so in this case, where the petitioner has described a different motivation. See Seng v. Holder, 584 F.3d 13, 19-20 (1st Cir.2009) ("Without some specific, direct, and credible evidence relative to her own situation, there is an insufficient nexus between the petitioner and the general unrest depicted in the country conditions reports.”).

. The Public Chamber was established to represent civil society and to foster tolerance. It was directed by President Putin. United States Department of State, Bureau of Democracy, Human Rights, and Labor, International Religious Freedom Report for Russia at 13 (Sept.2006), available at http://www.state. gov/ j/drl/rls/irP2006/71403.htm [hereinafter 2006 Religious Freedom Report ].