# United States Court of Appeals
## For the First Circuit

No. 10-1109

MARK and NILDA PRECETAJ,

Petitioners,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF

THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, <u>Chief Judge</u>,

Boudin and Thompson, <u>Circuit Judges</u>.

<u>Jeffrey B. Rubin</u> with whom <u>Law Offices of Jeffrey B. Rubin, P.C.</u> was on brief for petitioners.
<u>Andrea N. Gevas</u>, Civil Division, Department of Justice, with whom <u>Tony West</u>, Assistant Attorney General, <u>David M. McConnell</u>, Deputy Director, and <u>Stacy S. Paddack</u>, Senior Litigation Counsel, were on brief for respondent.

August 11, 2011

**BOUDIN**, <u>Circuit Judge</u>.  Mark and Nilda Precetaj--husband and wife--are citizens of Albania and seek review of administrative decisions denying their application for asylum and ordering their removal.  Nilda Precetaj entered the United States on May 5, 2002, on a temporary tourist visa that expired on November 4, 2002.  Mark Precetaj entered the United States on July 26, 2002, using a false Italian passport.

In January 2003, Mark Precetaj filed an application for asylum and withholding of removal that listed Nilda Precetaj as a derivative beneficiary.  Later, Nilda Precetaj applied for asylum, withholding of removal, and protection under the United Nations Convention Against Torture.  <u>See</u> 8 C.F.R. §§ 1208.16-18 (2011).  A series of hearings were held between 2005 and 2008, and Mark Precetaj provided evidence of the family's experience in Albania in the 1990s and up to 2002.

Albania is a former communist country in the Balkans whose dictatorial regime collapsed in the early 1990s; the collapse was followed by a long period of economic crisis and political upheaval.  In the late 1990s, the situation began to stabilize and today the country has a democratic constitution and holds regular elections.

In the past decade or so, the Socialist Party and the Democratic Party have dominated politics in Albania.  After a reconciliation in 1997, new elections were held and the Socialist

Party established control through a coalition. Then, in 2005, the Democratic Party leader became Prime Minister after his party won new elections held with what the State Department Asylum Profile called "a noticeably improved environment with little of the violence or intimidation that marred previous elections."

The experiences to which Mark Precetaj testified began over a decade before this 2005 election. After reporting the presence of state agents at a student Democratic Party demonstration in 1991, Mark Precetaj suffered threats and physical assaults. He attributed this in part to his support for the party--he was not a member of it--but also to fear that he might reveal crimes by Socialist Party members then in power that he learned of through his employment at the Albanian Supreme Court.

Initially, Mark Precetaj was merely threatened in telephone calls and told to keep his mouth shut. Thereafter, he was threatened and then beaten in 1993 by three men wearing masks. Although badly bruised, he did not report the incident to the police, knowing that they were infiltrated by Socialist Party members. In June 1997, he was threatened outside his home and told to expect retribution when the Socialist Party won the election, which it did.

In 1998, on the fifth anniversary of his beating, his car was set on fire in front of his home. In 1999, both of his children were targeted; his son was kidnaped once and beaten twice,

and his daughter was kidnaped and held for three days, during which time she was assaulted and raped. After his daughter's abduction, state security agents beat up Mark Precetaj again. With his encouragement, his children fled to the United States and have since been granted asylum.

In June 2001, Mark Precetaj was attacked and beaten by a man who repeated the same threats. When he reported this to the Democratic Party, he received another telephonic threat. In May 2002, he received a further telephone call to look outside for a present; doing so, he found at the door an envelope containing two bullets. His wife then fled to the United States; lacking a visa, he stayed behind but joined her later.

At the end of a series of hearings, the Immigration Judge ("IJ") on July 7, 2008, delivered an oral decision denying Mark and Nilda Precetaj relief. The IJ said that Mark Precetaj's testimony was credible and internally consistent, but described the incidents only in general terms: the IJ said that Mark Precetaj was "beaten on at least two occasions" and pointed out that he did not seek medical treatment or report the incidents to the police. The IJ also noted that (as of 2008) the Democratic Party had regained power in Albania.

There follow two sentences of analysis that comprise the heart of the decision:

> [T]he Court will and hereby does deny his
> application for asylum as the harm suffered by

-4-

the respondent himself does not, in the Court's opinion, rise to the level of past persecution. Even if the Court were to find otherwise, alternatively, the Court finds that circumstances in Albania have changed to the extent that the respondent would no longer have a well-founded fear of future persecution due to the fact that Democratic party is now the party in power in the country of Albania.

The IJ then said that any request for withholding of removal also failed because this relief requires an even higher probability of future persecution than the asylum standard; and any claim under the Convention Against Torture also failed, there being no evidence that Mark Precetaj would be tortured. In the hearings the IJ had taken note of an alternative form of relief available even where future persecution is not a threat--discretionary "humanitarian asylum" based on past persecution alone--but this was not separately discussed in the IJ's decision.

On review, the Board of Immigration Appeals ("the Board") affirmed. It upheld the finding of no past persecution summarily; alternatively, it said any presumption of future persecution had been rebutted by "a fundamental change in circumstances" in Albania, 8 C.F.R. § 1208.13(b)(1)(i)(A). As for humanitarian relief based on past persecution alone, the Board said Mark Precetaj's treatment did not rise to the required level for such discretionary relief.

On our review of a "final order of removal," Immigration and Nationality Act ("INA") § 242(a)(1), 8 U.S.C. § 1252(a)(1)

(2006), the findings of fact by the IJ are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," INA § 242(b)(4)(B); questions of law are subject to de novo review, McNary v. Haitian Refugee Ctr. Inc., 498 U.S. 479, 493 (1991). The substantive criteria and bases for relief are contained in the INA and accompanying regulations.

Pertinently, asylum normally depends on a reasonable fear of future persecution by the government (directly or because of inaction), Orelien v. Gonzales, 467 F.3d 67, 72 (1st Cir. 2006), due to one of a set of enumerated grounds such as political opinion. INA § 101(a)(42); 8 C.F.R. § 1208.13(b)(2)(i)(A). Usually, although not invariably, this is based on past persecution because, where an applicant establishes past persecution, a rebuttable presumption arises of a well-founded fear of future persecution, 8 C.F.R. § 1208.13(b)(1). In turn, the government may rebut the presumption with a showing of a fundamental change in circumstances in the country or the opportunity to relocate safely within it, 8 C.F.R. § 1208.13(b)(1)(i).

Where the presumption is rebutted, then absent other evidence from the applicant, asylum must be denied, 8 C.F.R. § 1208.13(b)(1)(i), unless the applicant demonstrates severe past persecution (or establishes a "reasonable possibility" of "other serious harm"); if such severe persecution is established, the immigration judge has discretion to grant asylum, 8 C.F.R. §

-6-

1208.13(b)(1)(iii)--such relief sometimes being known as "humanitarian asylum," In re Chen, 20 I. & N. Dec. 16, 21 (BIA 1989).

In ordinary asylum cases, often the central issue turns on whether the applicant's story of past abuse is to be believed, and the IJ and the Board have considerable latitude in evaluating credibility. A negative assessment gets substantial weight in this circuit when backed by explanation including demeanor evidence, inconsistencies, improbabilities, or failure to produce confirming evidence that ought to be available.[1] However, in this case Mark Precetaj's testimony was accepted as true by the IJ.

"Persecution," even linked to the government and based on a listed ground (both conditions implicitly accepted as satisfied by the IJ here), entails something more than the casual or occasional mistreatment that is common in many countries. "[A] person's experience must rise above unpleasantness, harassment, and even basic suffering," Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000); much depends on the "severity, duration, and frequency of

---

[1]See Sunoto v. Gonzales, 504 F.3d 56, 59-61 (1st Cir. 2007); Shahari v. Gonzáles, 407 F.3d 467, 474-75 (1st Cir. 2005); Disu v. Ashcroft, 338 F.3d 13, 17-18 (1st Cir. 2003); Bojorques-Villanueva v. INS, 194 F.3d 14 (1st Cir. 1999). Cf. Sok v. Mukasey, 526 F.3d 48, 55-56 (1st Cir. 2008).

physical abuse." Topalli v. Gonzales, 417 F.3d 128, 133 (1st Cir. 2005).[2]

However, in this case, the IJ and the Board have not given a persuasive explanation for rejecting the claim of past persecution. Standing alone, the incidents of threats and violence directed against Mark Precetaj are substantial and continued over almost a decade; and they were arguably based on interrelated motives: his support for the political opposition and the derivative concern of those in power that he would reveal information about abuses that he had garnered through his work.

True, Mark Precetaj was never jailed, none of the violence sent him to a hospital, and if this were all we could not casually reject the agency judgment. The case would fall within that gray area of sporadic and limited abuse which is the lot of many persons around the world but is not the exceptional and sustained violence or other forms of persecution that compel the agency to grant asylum.

But the systematic and serious abuse of the children adds another dimension. Two kidnapings, three beatings, and an aggravated rape of his children--specifically designed to send a message to Mark Precetaj--were clearly part of the persecution of

---

[2]The Board has often rejected persecution claims, and been upheld, where only a single incident, often of a severe beating or mistreatment, has occurred. E.g., Decky v. Holder, 587 F.3d 104, 111-12 (1st Cir. 2009); Khan v. Mukasey, 549 F.3d 573, 576-77 (1st Cir. 2008); Guzman v. INS, 327 F.3d 11, 15-16 (1st Cir. 2003).

-8-

him.  Sok v. Mukasey, 526 F.3d 48, 54-55 (1st Cir. 2008); Jorqi v. Mukasey, 514 F.3d 53, 57 & n.3 (1st Cir. 2008).  Only the IJ mentions these further abuses, and only does so briefly ("[Mark Precetaj] described incidents in which both of his children were subjected to past persecution . . . .").

If there is a reason for discounting or ignoring these incidents, it is not explained in either decision.  And if they are taken into account, it is not apparent why the sum total of the abuse directed against Mark Precetaj would not qualify as persecution.  The discrepancy is underscored by the fact that the persecuted family members were themselves granted asylum.  Ticoalu v. Gonzáles, 472 F.3d 8, 11-12 (1st Cir. 2006).  Cf. Cendrawasih v. Holder, 571 F.3d 128, 130 (1st Cir. 2009).  On this issue a remand is required.

The alternative ground given by both the IJ and Board is more powerful.  Notwithstanding past persecution, changed country conditions make unreasonable any legitimate fear of future persecution.  The 2007 Country Report and the 2006 Asylum Profile confirm a decreasing level of violence following the 1998 elections and steadily improving since then, culminating in the 2005 victory of the Democratic Party.  Neither the IJ nor Board discussed these changes in detail, but the two documents are part of the record and provide pertinent evidence.

-9-

However, "changed country conditions do not <u>automatically</u> trump the applicant's specific evidence" in every case, <u>Waweru</u> v. <u>Gonzales</u>, 437 F.3d 199, 203 (1st Cir. 2006) (internal quotation omitted); <u>accord</u> <u>Mihaylov</u> v. <u>Ashcroft</u>, 379 F.3d 15, 23 (1st Cir. 2004). Here, as Mark Precetaj points out in his brief, there is evidence that <u>local power</u> is still wielded by the Socialist Party; and, logically those who feared disclosures by him have as much or even more reason to fear disclosures of their past wrongs now that the Democratic Party is in power. In its brief on appeal, the government is silent as to this continuing threat.

Such a specific and colorable threat is based on a motive for and conditions facilitating further persecution despite the 2005 takeover of the central government by the Democratic Party; and it distinguishes cases in which the 2005 elections or a general improvement in conditions were found adequate to refute the likelihood of further persecution. <u>E.g.</u>, <u>Uruci</u> v. <u>Holder</u>, 558 F.3d 14, 17 (1st Cir. 2009); <u>Tota</u> v. <u>Gonzales</u>, 457 F.3d 161, 166-67 (1st Cir. 2006). In many cases, these changes may be enough to refute the presumption but not necessarily in all.

Indeed, in <u>Waweru</u> we agreed that retention of local power by former persecutors could favor the asylum seeker's claim and make a simple change in central government insufficient to rebut the presumption. 437 F.3d at 204. The claim faltered there because the <u>motive</u> for past persecution--the applicant's opposition

-10-

to a one party state--had itself disappeared with the disappearance of the party and the loss of any power by its erstwhile leader. Id. Here, the motive for persecution of Mark Precetaj by local officials may well remain intact.

There remains Mark Precetaj's alternative claim that humanitarian asylum was justified--the fall-back category described above. In Waweru, we said that this "humanitarian asylum" is granted only in cases of "extraordinary suffering" and that "arbitrary arrests and beatings" do not suffice. 437 F.3d at 205 (internal quotations omitted), accord Tokarska v. INS, 978 F.2d 1, 1 (1st Cir. 1992) (per curiam)("[A]n alien must show past persecution so severe that repatriation would be inhumane." (internal quotations omitted)).

Humanitarian asylum is available even if there is no risk of future persecution, but the paradigm case is one in which so much abuse has been directed against the victim that the suffering is projected into the future and that a return of the applicant to the place where the harm was inflicted would magnify the prior suffering. E.g., Brucaj v. Ashcroft, 381 F.3d 602, 604 (7th Cir. 2004) (applicant brutally gang-raped in front of her parents).[3] This limited discussion is sufficient for our purposes, because on

_____

[3]Accord, Sowe v. Mukasey, 538 F.3d 1281, 1287 (9th Cir. 2008); Lal v. INS, 255 F.3d 998, 1009-10 (9th Cir. 2001); Lopez-Galarza v. INS, 99 F.3d 954, 963 (9th Cir. 1996); Rodriguez-Matamaros v. INS, 86 F.3d 158, 160-61 (9th Cir. 1996).

-11-

these particular facts the claim plainly fails:  Mark Precetaj's simple statement that he continues to suffer hardly establishes the necessary level of suffering.

Mark Precetaj asserts that the IJ and Board failed even to address his claim for humanitarian asylum, but the IJ discussed the issue in the hearing and the Board explicitly rejected the claim.  Absent a prima facie case of "extraordinary suffering" and some reasonable prospect of a grant, it can hardly be expected that every case should entail a detailed discussion of a last-resort form of relief that is difficult to obtain and rarely granted. See generally Ang v. Gonzales, 430 F.3d 50, 58 (1st Cir. 2005).

The order of the Board affirming the IJ decision is vacated and the matter is remanded for proceedings on the past persecution and changed country conditions issues consistent with this decision.

It is so ordered.