# United States Court of Appeals
## For the First Circuit

No. 11-1814

PAVEL IVANOV; IRINA KOZOCHKINA,

Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Thompson, and Kayatta,
<u>Circuit Judges</u>.

 <u>Randy Olen</u>, with whom <u>Robert D. Watt, Jr.</u> was on brief, for petitioners.
 <u>Andrew Nathan O'Malley</u>, with whom <u>Stuart F. Delery</u>, Acting Assistant Attorney General, Civil Division, <u>Ernesto H. Molina, Jr.</u>, Assistant Director, Office of Immigration Litigation, and <u>D. Nicholas Harling</u>, Attorney, Office of Immigration Litigation, were on brief, for respondent.

November 15, 2013

**THOMPSON, Circuit Judge.**  Petitioners Pavel Ivanov and

Irina Kozochkina seek review of a final order of removal.  They say

the immigration courts erred by finding that the persecution Ivanov

experienced in Russia was not "on account of" his Pentecostal

faith.  We agree.  After careful consideration of the decision and

the record, we vacate and remand for additional proceedings.

### Facts and Procedural History

Petitioners are natives and citizens of Russia.  Ivanov

is a long-standing member of the Pentecostal Church, which

Kozochkina, a Baptist, now attends.[1]

Petitioners entered the United States in May 2003 on

five-month educational exchange visas.[2]  Having heard from family

and fellow Pentecostals in Russia of ongoing threats and violence

against persons of their faith, Petitioners overstayed their visas

and applied for asylum, withholding of removal, and relief under

---

[1] Petitioners' claims derive from Ivanov's experiences as a Pentecostal in Russia in the 1990s and early 2000s.  Given that Kozochkina's claims are derivative of Ivanov's, we will discuss only Ivanov's entitlement to relief.

[2] Petitioners' visas list September 2003 as their expiration date.  However, because Petitioners never entered the educational programs for which their visas were issued, the government asserts that their status actually expired in June 2003, thirty days after their entry.  This discrepancy is not relevant to this appeal.

the Convention Against Torture (CAT) in September 2004.[3] Petitioners were married in Newport, Rhode Island in October 2004.

In August 2005, the Department of Homeland Security (DHS) served Petitioners with Notices to Appear, charging them with removability under the Immigration and Nationality Act. See 8 U.S.C. § 1227(a)(1)(B). Petitioners filed amended applications for asylum, withholding of removal, and CAT relief in June 2007. They appeared before an Immigration Judge (IJ) in a series of hearings between 2006 and 2009. Because the IJ found Ivanov credible, we recount the facts here as Ivanov presented them in his documentation and testimony.

Ivanov was born in Chelyabinsk, Russia on November 21, 1983. His parents raised him in the Pentecostal faith, practicing in secret during the anti-religious Soviet regime, then joining a church in 1995 as Russia began to open up to religion after the fall of communism.

Pentecostals represent a religious minority in Russia.[4] Though the Russian Constitution provides for freedom of religion, "[m]any citizens firmly believe that adherence to the Russian

---

[3] Because Petitioners missed the one-year filing deadline for asylum by only three months, the Immigration Judge gave Petitioners "the benefit of the doubt" and treated their claim as timely.

[4] United States Department of State, Bureau of Democracy, Human Rights and Labor, Russia: Country Reports on Human Rights Practices 20 (Mar. 2007), available at http://www.state.gov/j/drl/rls/hrrpt/2006/78835.htm [hereinafter 2006 Country Report].

Orthodox Church . . . is at the heart of their national identity,"[5] and "members of minority and 'non-traditional' religions," including Pentecostals, "continue to encounter prejudice, societal discrimination, and in some cases physical attacks."[6]  Local authorities reportedly do not adequately respond to such attacks.[7] For example, prior to 2005, Evangelicals and Pentecostals in various regions reported the vandalizing and burning of prayer houses, including in Ivanov's hometown of Chelyabinsk, where authorities made no arrests.[8]

Ivanov's memories of problems for his church date back to March 1996, when he learned that members of the Russian Orthodox Church intercepted Pentecostal literature sent from France.  Then, on January 7, 1997 (Orthodox Christmas), he heard that a group of "Barkashovtsy" — Russian nationalist, neo-Nazi "skinheads"[9] — had burned his church's office and beat up the night watchman.  Later, on May 30, 1999, while Ivanov and his parents were visiting their

---

[5] United States Department of State, Bureau of Democracy, Human Rights and Labor, <u>Russia: International Religious Freedom Report</u> 1 (Sept. 2006), <u>available at</u> http://www.state.gov/j/drl/rls/irf/2006/71403.htm [hereinafter <u>2006 Religious Freedom Report</u>].

[6] <u>2006 Country Report</u> at 1.

[7] United States Commission on International Religious Freedom, <u>Policy Focus on Russia</u> 14 (Fall 2006) [hereinafter <u>Policy Focus</u>].

[8] <u>2006 Religious Freedom Report</u> at 15.

[9] Henceforth, "skinheads," for ease of reference.

pastor's home for Pentecost, a mob led by a disgraced Russian Orthodox priest attacked the home, beating the pastor's wife, looting the premises, and burning religious literature.

Ivanov testified that he was personally mistreated because of his religious beliefs on several occasions. First, on November 21, 1999, during Ivanov's baptism into the Pentecostal faith on his sixteenth birthday, bystanders heckled and threw bottles at celebrants during the initial ceremony at a public pool. That evening, while rites continued at the prayer house, skinheads burst in, shot rubber bullets, confiscated literature, and ransacked the house.

Second, on April 20, 2002, the anniversary of Hitler's birth, skinheads attacked Ivanov as he left the church-run drug rehabilitation center where he volunteered.[10] His church operated the center as part of its mission of public service. Patients

---

[10] Ivanov recounts that the skinheads were often more aggressive around the time of "Hitler's Birthday." He cites April 20, 2000, as another example of when skinheads attacked a Pentecostal prayer house. They wreaked havoc and covered the walls with insulting slurs and swastika graffiti. Luckily, no parishioners were present or harmed.

Ivanov's assertion that skinheads commemorate "Hitler's Birthday" is confirmed by the 2006 Country Report, which highlighted a display of Nazi posters on April 20, 2005 as occurring "on the anniversary of Hitler's birth." 2006 Country Report at 21. It also reported the firebombing of a Baptist church in Chelyabinsk and the arson of an Adventist church in another region during that same month (though it did not specify whether those events also occurred on April 20). Id. at 20.

received medical treatment and followed a strict regimen of daily bible study.

That night, as Ivanov left the center, four young skinheads "knocked [him] down and dragged [him] 3 blocks" to a basement where he was "chained and beaten with full plastic water bottles." They handcuffed him, then applied an electric shock to one hand and put cigarettes out on the other. They told him he had two days to figure out how to close the church's "'satanic' dispensary." The skinheads then left Ivanov for nearly three days without food and water. His parents filed a police report, but to their knowledge no action was taken. Fortunately, the skinheads released Ivanov of their own accord a few days later. It was only after Ivanov's release that he realized the drug rehabilitation center's work interfered with the skinheads' lucrative drug trade.

Third, in February 2003, Ivanov "was summoned to the local police department." There, a federal security service officer identified as Major Kozlov ordered Ivanov to provide false testimony in the prosecution of his pastor. Prosecutors accused the pastor of using hypnosis to extort a ten-percent tithe from congregants. Major Kozlov told Ivanov he "would be sorry for not cooperating" with the prosecution.

A few days later, in early March 2003, four skinheads attacked Ivanov in the lobby of his apartment building. They beat him with batons while wearing rubber gloves, bruising his legs so

-6-

severely that he missed school for a week. Although they wore no uniforms, Ivanov knew they were skinheads by the weapons they used. Because the beating occurred shortly after Ivanov's conversation with Major Kozlov, Ivanov believes the skinheads were retaliating against him for his refusal to testify against his pastor. Ivanov called the police when he got back to his apartment, but no one ever came. Ivanov did not seek further police assistance or medical attention because he thought it would be futile.

Fourth, on April 22, 2003, unknown assailants threw Molotov cocktails at Ivanov's home in the middle of the night. Ivanov, his father, and his mother were home. Fortunately, Ivanov's mother was awake and the family was able to put out the resulting fire. That same night, the church's drug rehabilitation center also was set on fire. Ivanov did not see the people who threw the Molotov cocktails, but based on the perpetrators' precision and the familiar timing of the attacks — almost exactly one year after skinheads accosted him as he left the center and just two days after "Hitler's Birthday" — he believes the skinheads were again responsible. Petitioners left Russia and came to the United States roughly one month after this incident.

In his asylum application, Ivanov stated that he feared if he returned to Russia, skinheads would "sever[e]ly harm[] or kill[]" him, or the federal security service would imprison him on "trumped-up" charges or confine him to a mental facility under a

false diagnosis, because of his membership in a "non-traditional" sect and his refusal to testify falsely against his pastor. At a hearing before the IJ in July 2007, after recounting his past mistreatment, Ivanov said he feared if he returned to Russia, "the same thing would [happen]." He also said he would "continue to be [subject] to the same lawlessness that [he] felt before."

When Ivanov's attorney asked if he had any fear of the government, Ivanov explained that it was "a well-known and established fact that . . . the skinheads . . . are connected to the government structure." He elaborated that because he "look[ed] like [a] Russian" and his religious beliefs were not outwardly apparent, the only way the "young kids" who attacked him would know that he did not fit their view of a "pure nation [or] pure race in Russia" is by the guidance or influence of "somebody from above."

In July 2009, the IJ delivered an oral decision denying Petitioners relief. Although the IJ found Ivanov's testimony to be credible and generally consistent, he determined that Ivanov "fell short of credibility" where he drew "conclusions . . . from the facts" and engaged in "speculation . . . with regard to the abusive activity of the skinheads." Accepting for the sake of discussion that Ivanov's experiences amounted to past persecution, the IJ dismissed Ivanov's assertion that the skinheads were connected to government authorities as mere supposition without record support. He further concluded that Ivanov's admission that "the skinheads

wanted to close the [church's] drug rehabilitation center because it was having a negative effect on their drug trade" meant that "[t]he motivation of the skinheads was an intention to profit by criminal activity, rather than to punish [Ivanov] and others for engaging in the Pentecostal faith." Finally, he found that Ivanov's fear of return to Russia was based on "the general lawlessness of the place," rather than abuse due to his religion.

As a result, the IJ found that Ivanov had not shown he experienced persecution "on account of" a protected ground, and thus he failed to qualify for asylum. Ivanov therefore also fell short of the more stringent standard for withholding of removal. Finally, Ivanov's claim for CAT relief failed because there was no evidence that Ivanov had been or would be tortured at the hands of public officials or with the government's acquiescence if he returned to Russia. The IJ consequently denied Petitioners' applications but granted them voluntary departure.

Petitioners appealed. On review, the Board of Immigration Appeals (BIA) affirmed the IJ's decision without opinion. This appeal followed.

**Standard of Review**

Ordinarily, we review decisions of the BIA, not the IJ. Larios v. Holder, 608 F.3d 105, 107 (1st Cir. 2010). However, where, as here, "the BIA summarily affirms the IJ's asylum

-9-

determination, . . . we review the IJ's decision as if it were the decision of the BIA."  Id.

We review an IJ's findings of fact, including the determination of whether persecution occurred on account of a protected ground, under the familiar and deferential substantial evidence standard.  Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007).  Under this rule, we respect the IJ's findings if "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Larios, 608 F.3d at 107 (quoting Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 (1992)).  However, "our deference is not unlimited," and "we may not affirm [the IJ's findings]" if "we cannot conscientiously find that the evidence supporting [them] is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [IJ's] view."  Kartasheva v. Holder, 582 F.3d 96, 105 (1st Cir. 2009) (citations omitted) (internal quotation marks omitted).  Indeed, we are obligated to reject the IJ's findings if a "reasonable adjudicator would be compelled to conclude to the contrary."  Precetaj v. Holder, 649 F.3d 72, 75 (1st Cir. 2011) (quoting 8 U.S.C. § 1252(b)(4)(b)).

## Discussion

We begin with a brief overview of pertinent asylum law. To qualify for asylum, an alien must establish that he is a

refugee. 8 U.S.C. § 1158(b)(1)(A). A refugee is a person who is unable or unwilling to return to his homeland "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Proof of past persecution creates a presumption of a well-founded fear of future persecution that the government may rebut. Harutyunyan v. Gonzales, 421 F.3d 64, 67 (1st Cir. 2005); see also 8 C.F.R. § 1208.13(b)(1).

Persecution is not defined by statute, but we know that it requires "more than ordinary harassment, mistreatment, or suffering." Lopez de Hincapie, 494 F.3d at 217. To constitute persecution, abuse "must have reached a fairly high threshold of seriousness, as well as some regularity and frequency." Rebenko v. Holder, 693 F.3d 87, 92 (1st Cir. 2012) (quoting Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006)) (internal quotation marks omitted).

Persecution also "always implies some connection to government action or inaction," whether in the form of direct government action, "government-supported action, or government's unwillingness or inability to control private conduct." Sok v. Mukasey, 526 F.3d 48, 54 (1st Cir. 2008) (citations omitted) (internal quotation marks omitted); see also Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir. 2009). Local authorities' failure to

respond to prior persecution may demonstrate a government's unwillingness or inability to control persecutors. Cf. Ortiz-Araniba v. Keisler, 505 F.3d 39, 42 (1st Cir. 2007) (quoting Harutyunyan, 421 F.3d at 68) ("In determining whether a government is willing and able to control persecutors, . . . a prompt response by local authorities to prior incidents is 'the most telling datum.'").

For purposes of asylum, an alien must also demonstrate that the persecution he experienced occurred "on account of" a statutorily-protected ground. Lopez de Hincapie, 494 F.3d at 217. To meet this "nexus" requirement, an alien must provide sufficient evidence of an actual connection between the harm he suffered and his protected trait. Id. at 217-18. This does not require him "to identify [his] antagonists with absolute certainty," id. at 219, or "to show that the impermissible motivation was the sole motivation for the persecution," Sompotan v. Mukasey, 533 F.3d 63, 69 (1st Cir. 2008) (citing In re S-P-, 21 I. & N. Dec. 486, 490 (BIA 1996)) (emphasis added). Rather, he must demonstrate only "that the persecution was based, 'at least in part,' on an impermissible motivation." Id. (quoting Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1232-33 (11th Cir. 2007)).

In many asylum cases, the central issue is whether the applicant's story of past abuse is credible. Precetaj, 649 F.3d at

The IJ has "considerable latitude in evaluating credibility," and its assessment receives substantial weight.  Id.

In this case, the IJ found that Ivanov's testimony about the mistreatment he experienced was credible, generally internally consistent, and consistent with the record.  Based on this testimony, the IJ observed it was "a close question" as to whether Ivanov established past persecution, but assumed for the purpose of discussion that he had done so.  Relying on the IJ's credibility determination, we find that Ivanov met the past persecution threshold.

As outlined above, Ivanov testified about four specific occasions of mistreatment because of his Pentecostal faith within a four-year period: (1) when skinheads violently interrupted his baptism ceremony at a prayer house in November 1999; (2) when skinheads attacked him as he left the church-run drug rehabilitation center where he volunteered, beat him up, handcuffed and shocked him, and left him in a basement for three days without food and water in April 2002; (3) when skinheads attacked him in his apartment lobby a few days after he refused to comply with a federal security officer's forceful request that he testify against his pastor in March 2003; and (4) when unidentified assailants launched Molotov cocktails at his home in April 2003.

Ivanov also testified to a history of mistreatment of his congregation reaching back to his youth, including the repeated

confiscation of religious literature, looting and burning of prayer houses, and violence against church members. Ivanov's testimony was consistent with U.S. State Department human rights reports describing the mistreatment of Pentecostals and persons of other minority religions in Russia, including incidents occurring on or around the anniversary of Hitler's birth.[11]

Considered together, these events suggest a pattern of escalating abuse directed at Ivanov beginning the day he was baptized and continuing until he left the country. The harm Ivanov suffered, particularly during his three-day detention in April 2002, rose above "ordinary harassment, mistreatment, or suffering." See Sok, 526 F.3d at 54 (six events occurring over the course of four years, considered together, suggested a pattern of abuse, where the most serious incident involved a three-day detention). Ivanov's mistreatment occurred regularly and with some frequency for four years. Viewed within the broader context of intolerance and abuse of Pentecostals in Russia as documented in the U.S. State Department human rights reports, these incidents reach the "fairly high threshold of seriousness" required of persecution. See Pulisir v. Mukasey, 524 F.3d 302, 308-09 (1st Cir. 2008) ("Common sense suggests that larger social, cultural, and political forces can lend valuable context to particular incidents and, thus, can

---

[11] See 2006 Country Report at 1, 18-22; 2006 Religious Freedom Report at 9-15.

influence the weight that a factfinder may assign to those incidents.").

Seen in this context, these abuses also demonstrate the requisite nexus to government action or inaction. Here, Ivanov testified that his parents contacted the police when skinheads kidnapped him for three days in April 2002, but no follow-up action was taken. There is nothing in the record to suggest that Ivanov's abusers were ever apprehended, punished, or even looked for, in spite of having severely beaten and detained him for three days.[12] This is consistent with reports that local authorities do not adequately respond to attacks against members of minority religious communities, including Pentecostals.[13]

---

[12] We do not, as the dissent suggests, fault the police for not finding Ivanov during the days he was detained. We are certainly aware that even the best police work will not always enable police to halt a criminal in the act. However, here, there is no evidence of the police either seeking Ivanov while he was kidnapped or contacting Ivanov after he was released to try to find his attackers or to ensure his protection from future violence. We consider this to be the very definition of police inaction.

[13] Policy Focus at 14 (citing, inter alia, an attack by youths following a Pentecostal service in 2006 where authorities failed to act). Indeed, one of the U.S. Commission on Religious Freedom's key concerns about Russia is "[t]he rise in xenophobia and ethnic and religious intolerance, resulting in an increased number of violent attacks and hate crimes, and the government's failure to address this serious problem adequately." Id. at 3. Their report details a range of attacks motivated by religious or ethnic hatred and the authorities' lackluster responses, such as classifying hate crimes as mere "hooliganism." Id. at 3-6. The 2006 Country Report likewise noted that while "[a]uthorities usually investigated incidents of religious vandalism and violence, . . . arrests of suspects were extremely infrequent and convictions were rare." 2006 Country Report at 20.

Furthermore, skinheads attacked Ivanov in March 2003 only days after a federal security officer tried to intimidate him into testifying against his pastor. This fits with accounts that members of the federal security service "increasingly treat[] the leadership of some minority religious groups as security threats."[14] It also aligns with religious leaders' apprehensions "that Russian government officials provide tacit or active support to a view held by many ethnic Russians that Orthodoxy is the country's so-called 'true religion.'"[15] Moreover, it shows that local authorities have significant opportunities to restrict individuals' religious freedoms, leading to great variation between the laws on the books and national policies on the one hand, and the on-the-ground reality on the other.[16]

Ivanov contacted the police immediately after the March 2003 attack, but again no one came to his aid. As in April 2002, there is no evidence that the police made any efforts to apprehend or punish Ivanov's attackers. It is no wonder Ivanov thought further attempts to elicit police assistance would be "futile."

Although the IJ did not credit Ivanov's assertion that skinheads were "used by the police as surrogates" or "aided and abetted by the authorities," Ivanov was not required to make such

---

[14] 2006 Religious Freedom Report at 1.

[15] Policy Focus at 4.

[16] 2006 Country Report at 18-19.

a showing to qualify for asylum.  Ivanov had only to establish that the government was unable or unwilling to control the skinheads' actions, see Sok, 526 F.3d at 53, and it appears clear from the record that this is the case.  Local authorities either failed to take action against, or perhaps even supported, Ivanov's persecutors.  Their failure to respond signals their unwillingness or inability to control Ivanov's persecutors.[17]  Cf. Ortiz-Araniba, 505 F.3d at 42.  Accordingly, we make explicit what the IJ assumed and hold that Ivanov demonstrated past persecution linked to government action or inaction.

We next turn to the question of nexus to a protected ground.  Although the IJ was willing to accept that Ivanov proved past persecution, he found that Ivanov did not establish a sufficient connection between the abuse he suffered and his religion.  As set out above, the IJ provided two reasons for his finding: (1) he interpreted Ivanov's admission that skinheads opposed the drug rehabilitation center because of its negative impact on their drug trade as an indication that they were not punishing Ivanov for engaging in his Pentecostal faith; and (2) he

---

[17] The dissent goes out of its way and far beyond the record to say we are assuming that only actual arrests by government authorities — in Russia or the United States — demonstrate their willingness or ability to control religious persecutors.  We said no such thing. The evidence here not only shows a failure to arrest, but a total failure to investigate or follow up with Ivanov on any of the occasions he was attacked.  This utter lack of intervention or action compels us to conclude Ivanov cannot live safely in Russia without facing persecution.

concluded that Ivanov's fear of return to Russia was based on "the general lawlessness of the place, rather than mistreatment on account of" his religion.  Considering the record as a whole, we are unable to find that either of these rationales or the IJ's ultimate determination was "supported by reasonable, substantial, and probative evidence."[18]

First, the IJ's fixation on the skinheads' drug trade to the exclusion of any other motivation is misguided on principle and on fact.  As a matter of principle, we do not require an alien to show that an impermissible motivation was the sole motivation for his persecution.  Sompotan, 533 F.3d at 69.  We have noted that aliens "seldom know the 'exact motivation[s]' of their persecutors and, of course, persecutors may often have more than one motivation."  Id. (alteration in original) (quoting In re S-P-, 21 I. & N. at 490).  Our sister circuits agree.  See, e.g., Menghesha v. Gonzales, 450 F.3d 142, 148 (4th Cir. 2006); Mohideen v. Gonzales, 416 F.3d 567, 570 (7th Cir. 2005); Lukwago v. Ashcroft, 329 F.3d 157, 170 (3d Cir. 2003); Girma v. Immigration & Naturalization Serv., 283 F.3d 664, 667 (5th Cir. 2002); Borja v.

_____

[18] Though the IJ did not point this out as a concern, we note preliminarily that Ivanov identified his antagonists with sufficient certainty.  Ivanov's use of the term "skinheads" to describe his attackers implies that they shared the common appearance symbolic of their group membership.  Though they did not wear uniforms, Ivanov could also identify them by their choice of weapons: rubber batons and gloves in March 2003 and Molotov cocktails in April 2003.

Immigration & Naturalization Serv., 175 F.3d 732, 735-36 (9th Cir. 1999) (en banc); Osorio v. Immigration & Naturalization Serv., 18 F.3d 1017, 1028 (2d Cir. 1994).

The facts of this case illustrate the need for this principle. The IJ's determination that the skinheads were motivated only by their "intention to profit by criminal activity" ignores both the skinheads' overarching mission and the greater pattern of religiously-motivated abuse that Ivanov suffered. As Ivanov noted, the skinheads' raison d'etre is to "purify the Russian nation." They are notoriously xenophobic, racist, anti-Muslim, anti-Semitic, and, most relevantly here, intolerant of "adherents of 'foreign' religions."[19] The skinheads who attacked Ivanov in April 2002 may indeed have had an economic interest in closing the church's drug rehabilitation center. But they also, at their core, undoubtedly opposed the center's religious mission and methods. The center's religious message was inseparable from the service it performed: church volunteers operated the center and rigorous bible study was integral to patients' treatment. Indeed, it appears that Ivanov's skinhead assailants recognized this and gave voice to their anti-religious motivation when they told Ivanov to find a way to close the "satanic" center. That those skinheads may have had an additional motive for attacking Ivanov cannot

---

[19] See 2006 Country Report at 33.

reasonably be read to refute that they were also acting upon the central motive underlying their group identity.

This is especially true given the other abuse that Ivanov suffered. Remember, the April 2002 attack is only one of four events supporting Ivanov's asylum claim. In the other instances, Ivanov provided specific evidence of his attackers' anti-Pentecostal motivation. For example, in November 1999, skinheads attacked his baptism ceremony at a prayer house. In March 2003, skinheads attacked him a few days after he refused to testify against his pastor. In April 2003, unknown assailants threw Molotov cocktails at his house the same night that someone attacked the church's drug rehabilitation center. Considered in view of the history of attacks against members of his church community and religious intolerance in Russia at-large, a reasonable adjudicator would be compelled to conclude that each of the attacks, including the attack in April 2002, was based, "at least in part," on the impermissible motivation of Ivanov's Pentecostal faith. See Sompotan, 533 F.3d at 69.

Second, the IJ's interpretation of Ivanov's testimony that he feared "the same lawlessness" if he returned to Russia to mean that Ivanov feared "general lawlessness" in Russia runs counter to the record. The IJ appears to have construed Ivanov's statement out of context: Ivanov said he feared "the same lawlessness" immediately after he described the specific instances

of abuse discussed above, but the IJ took him to mean he feared "lawlessness" in Russia generally. To the contrary, Ivanov consistently maintained in his application and testimony that he feared if he returned to Russia skinheads or government authorities would harm him due to his religious beliefs.[20] The IJ's monocular focus on Ivanov's remark, to the exclusion of the balance of Ivanov's statements alleging specific fears of targeted persecution, is not supported by the record as a whole.

In sum, viewing the record in its entirety, including the evidence the IJ ignored or misconstrued, and relying on the IJ's own finding that Ivanov's testimony was generally credible, we cannot conscientiously find the IJ's determination that Ivanov did not establish the requisite nexus between the persecution he suffered and his Pentecostal faith is supported by substantial evidence. While we are mindful of the deferential nature of our standard of review, we are also cognizant of our obligation to reject the IJ's findings if, as here, a "reasonable adjudicator

---

[20] There is also nothing in the record to indicate that Russia is awash in the type of general civil strife or violence that we have held would not qualify an applicant for asylum. See, e.g., López-Castro v. Holder, 577 F.3d 49, 54 (1st Cir. 2009) ("A country-wide risk of victimization through economic terrorism is not the functional equivalent of a statutorily protected ground . . . ."); Aquilar-Solis v. Immigration & Naturalization Serv., 168 F.3d 565, 572 (1st Cir. 1999) ("Danger resulting from participation in general civil strife, without more, does not constitute persecution.").

would be compelled to conclude to the contrary." See Precetaj, 649 F.3d at 75 (quoting 8 U.S.C. § 1252(b)(4)(b)).  It is not the first time we have rejected an IJ's findings under this standard.  See, e.g., id. at 76; Kartasheva, 582 F.3d at 105-06; Sok, 526 F.3d at 56, 58; Heng v. Gonzales, 493 F.3d 46, 49 (1st Cir. 2007); Mukamusoni v. Ashcroft, 390 F.3d 110, 126 (1st Cir. 2004).  And so long as our review is not "a hollow exercise in rubber-stamping," we doubt it will be the last.  See Cuko v. Mukasey, 522 F.3d 32, 41 (1st Cir. 2008) (Cyr, J., dissenting).

We therefore find that Ivanov has established his eligibility for asylum.  Accordingly, we have no need to proceed to Petitioners' requests for withholding of removal or relief under CAT, and we do not reach them here.

## Conclusion

The order of the BIA affirming the IJ's decision is vacated and the matter is remanded for proceedings consistent with this decision.

**-Dissenting Opinion Follows-**

**KAYATTA, Circuit Judge, dissenting.** I respectfully dissent because the record does not compel us to reject the factual findings of the immigration judge. The immigration judge found that the serious abuse and harassment to which Ivanov credibly established he was subjected was not "on account of" his religion. Rather, the immigration judge concluded, Ivanov faced persecution on account of his association with a drug rehab center that posed a threat to the skinheads' illicit drug trade. The immigration judge also found that Ivanov failed to establish the required nexus to government acquiescence manifest through its action or inaction. Either of these findings, unless reversed, means that Ivanov has failed to establish an entitlement to asylum. See López de Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007) ("[S]howing a linkage to one of the five statutorily protected grounds [including religion] is 'critical' to a successful asylum claim." (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992))); Harutyunyan v. Gonzales, 421 F.3d 64, 68 (1st Cir. 2005) ("[P]ersecution always implies some connection to government action or inaction.").

As we have previously held, the question of the persecutor's motivation generates a "fact-specific" inquiry. López de Hincapie, 494 F.3d at 218. Similarly, the question of whether Ivanov established a connection between the government and his

-23-

abuse is also a finding of fact.  See Harutyunyan, 421 F.3d at 68.  Our review of both findings is therefore limited by the "highly deferential" substantial evidence test.  Larios v. Holder, 608 F.3d 105, 107 (1st Cir. 2010).  That test requires that we defer to the immigration judge's findings of fact as long as those findings are "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Id. (quoting Elias-Zacarias, 502 U.S. at 481).  As we observed more recently, in practical terms, the test turns on whether we are "compelled to conclude to the contrary."  Precetaj v. Holder, 649 F.3d 72, 75 (1st Cir. 2011) (quoting 8 U.S.C. § 1252(b)(4)(B)).

A.    **There Is Substantial Evidence to Support the Finding of Fact That Ivanov Was Not Persecuted on Account of His Religion and Has Not Established a Realistic Risk of Such Persecution in the Future.**

I begin by reviewing Ivanov's testimony, which supports the factual finding that the abuse visited on (or feared by) him was not on account of his religion.  I then address the arguments advanced by the majority for finding this evidence insubstantial.

1. **Ivanov's Own Testimony Directly Supports the Finding.**

This is not a case in which the immigration judge stretched to draw inferences to support a conclusion in the face of direct evidence to the contrary.  Instead, this is a case in which the direct evidence substantially and heavily supported the finding

that Ivanov was not persecuted on account of his religion. That evidence is as follows:

The skinheads who assaulted Ivanov in 2002 and 2003 were in the illegal drug trade, while Ivanov worked at a drug rehab center that, he claims, possessed evidence of the skinheads' illegal activity and, in any event, cut into their business. When the skinheads kidnapped Ivanov in April of 2002 they did so as he left the rehab center. They never demanded that he change his religion, or stop going to his church. To the contrary, their demands focused exclusively on the rehab center.

On direct exam, Ivanov volunteered the following explanation of why the skinheads locked him up: "they wanted me to shut down the operation of this rehab and because of that they locked me up in the basement." On cross, Ivanov both reinforced his testimony that the skinheads wanted the drug rehab center closed because it hurt their business, and unreservedly agreed that the center's Pentecostal affiliation was not what garnered the skinheads' opposition:

> Q: Sir, you testified that the skinheads that you say assaulted you when you were leaving the rehabilitation center wanted you to close the clinic or the center and you say in your asylum application that these skinheads had a very lucrative drug business, drug sale business and you also testified today that these skinheads were losing money because of the drug rehabilitation center. That was because the goal of the center was to try and help people get off drugs. Is that correct?
>
> A: Yes.

Q: So they didn't want the center shut down because it was a Pentecostal center. They wanted it shut down because they were losing drug sales, correct?

A: That is absolutely correct because these people have not a single notion about religion, but any church whether it be Protestant or Catholic it will also be on opposite side against the drugs.

**2. The Evidence Relied on by the Majority is Either Conjectural or, In Any Event, Insufficient to Compel Reversal.**

The foregoing evidence should be enough by itself to support the decision of the immigration judge, even if the evidence to the contrary cited by the majority were as substantial as described. In fact, for the following reasons, much of that contrary evidence is based on conjecture and is otherwise reasonably viewed as not especially substantial.

The majority points to a second attack on Ivanov that occurred almost a year after the skinheads delivered their narrowly-focused demand that the rehab center be shut down. There is no evidence (much less compelling evidence) that the attack was on account of Ivanov's religion. The majority nevertheless guesses that the attack was at the behest of the police, who had told Ivanov "days"[21] previously that he would regret not providing testimony to support charges that his pastor was hypnotizing his parishioners into tithing ten percent of their income to the Pentecostal church.

_____

[21] Ivanov spoke with the police officer in the "end of February" and was beaten on March 1st.

-26-

This conjecture falters on two levels. First, if conjecture is the game, then it would be equally plausible to suggest that the skinheads attacked Ivanov when they did because it was almost one year after they delivered their own unmet demand that he close the rehab center. In short, the skinheads had--and expressed--their own reasons and there is no need to imagine that the police put them up to their crime. Additionally, even if one were to assume that the police officer and the skinheads were in cahoots, there is no reason that one must also assume that religious animus played any role in the relationship. Certainly the gains of an illicit drug trade would provide an equally if not more customary and plausible motivation. The pastor, after all, actually ran the rehab center. Ivanov himself plainly implied such a drug-centered nexus:

> [I]t's a well-known and established fact that, you know, all the skinheads and similar organizations are connected to the government structure. For example, you know, our attempt to run this rehab for drug addicts, you know, was met with such resistance on their part and it's a well-known fact also that, you know, they profit from selling drugs . . . .

While Ivanov's statement is not dispositive, it leans towards suggesting that money, rather than religious animus, was a common interest shared by the skinheads and the police. Certainly the immigration judge was not required to speculate to the contrary.

The majority also points to the final attack on Ivanov, the 2003 firebombing of the apartment he shared with his parents.

There is nothing about this attack to compel the conclusion that it was motivated by religious animus. It actually coincided with an attack on the rehab center that same day. The rehab center and Ivanov (the person the skinheads knew worked there) were therefore again the common factor in the skinheads' selection of targets.

This is not to say that there was no evidence at all in Ivanov's favor. The majority notes that the skinheads once referred to the rehab center as "satanic" when they held him prisoner. But a single use of a religiously-charged word does not, on these facts, compel us to find the skinheads' abuse of Ivanov was on account of his religion. See Sompotan v. Mukasey, 533 F.3d 63, 70 (1st Cir. 2008). In Sompotan we rejected the argument that the immigration judge was compelled to conclude that "hooligans" who robbed the petitioners and their restaurant yelling "Chinese bastard, crazy Christian, crazy Chinese" were motivated by religious and racial animus rather than by a desire to rob, noting that "[t]he fact that hooligans would stoop to the level of using racial slurs is, unfortunately, not surprising." Id. at 70. Indeed, as noted above, Ivanov himself did not regard his kidnapping as religiously motivated. How then can a court say that the immigration judge was compelled to disagree?

The majority also correctly notes that there is evidence in the record of earlier attacks not limited in their apparent focus to rehab center activities and personnel. These attacks

occurred in 1997 (on the congregation's office), 1999 (on a Pentecost service at Ivanov's pastor's house and on Ivanov's baptism), and 2000 (on a Pentecostal prayer house). The majority's view presumes that the abuse of Ivanov several years later was a refocusing of these earlier, religiously-motivated attacks directed at the church. Under this view, the skinheads attacked the rehab center because it was both a visible symbol of the church and a threat to their drug trade. This view is certainly plausible. I am at a loss, though, to see how it is so compelling that it requires rejection of the alternative view adopted by the immigration judge.

There is no evidence compelling us even to conclude that the same individuals were behind the earlier and later attacks, much less that their motivations remained constant. Indeed, there is no evidence that the "skinheads" involved in these various incidents are all part of a single group with a unified and disciplined mission and motivation.[22] As chronicled above, those individuals behind the later attacks expressly limited their demands to ending the drug rehab activity. And certainly Ivanov's experience in dealing with those assailants persecuting him suggested that greed was their monocular focus. As we held before,

---

[22] Indeed, Ivanov described the skinheads who kidnapped him as "very young kids" and said that "some of them" were "around 16." This suggests that they may well not have been personally involved in incidents several years before.

where the evidence suggests a plausible motivation not within the ambit of the statute's protection, we defer to the choice made by the immigration judge to deny asylum on that basis.  See López de Hincapie v. Gonzales, 494 F.3d 213, 219 (1st Cir. 2007).

The majority also relies on evidence that skinheads in Russia often possessed and acted on religious animus and that their activities often spiked on the anniversary of Hitler's birth.  But if the skinheads who kidnapped and later beat Ivanov shared that religious animus, for some unknown reason they were remarkably reluctant to voice such views to Ivanov, while nevertheless making forcefully clear their strong desire to profit from and protect their drug trade.  The factual finding that the abuse here, directed at the rehab center and its worker, was motivated only by the latter desire is a type of choosing among plausible scenarios that is within the purview of the immigration judge, not a reviewing court.  See Amouri v. Holder, 572 F.3d 29, 34 (1st Cir. 2009) ("The mere fact that the extortionists were associated with an extremist group [did] not compel" us, on its own, to reverse a finding that petitioner's persecution was not on account of a

protected characteristic because "fanaticism and a love of money are not mutually exclusive.").[23]

The immigration judge who heard this case was hardly out to get Ivanov. He expressly found Ivanov credible in his recounting of events he had witnessed. The immigration judge was also willing to assume that the instances of abuse to which Ivanov was subjected over seven years rose to the very high level of actual persecution. Cf. Topalli v. Gonzales, 417 F.3d 128, 129-32 (1st Cir. 2005) (no persecution where petitioner was arrested, detained, and beaten over the course of three years but never required medical attention and was not abused for three years before leaving the country); Bocova v. Gonzales, 412 F.3d 257, 261-63 (1st Cir. 2005), superseded in unrelated part by 8 C.F.R. § 1240.26(i), as described in Garfias-Rodriquez v. Holder, 702 F.3d 504, 524 (9th Cir. 2012) (two beatings twenty-five months apart, one of which caused petitioner to lose consciousness and require hospitalization, insufficient to compel a finding of persecution). The majority readily adopts the immigration judge's assumption of persecution and his finding that Ivanov was credible in relating

---

[23] Nor can the majority's citations to country reports containing evidence that religious animus sometimes motivates persecution in Russia compel a finding that it did so in this case, where the petitioner has described a different motivation. See Seng v. Holder, 584 F.3d 13, 19-20 (1st Cir. 2009) ("Without some specific, direct, and credible evidence relative to her own situation, there is an insufficient nexus between the petitioner and the general unrest depicted in the country conditions reports.").

facts, but then proceeds to criticize the immigration judge's reasoning simply because he also chose to believe Ivanov's testimony that the particular people who attacked him "have not a single notion about religion," and were instead motivated by protecting their drug trade. The immigration judge witnessed the testimony, heard Ivanov's tone, saw his facial expressions, and concluded that the testimony I have quoted above was due great weight.

Nor can the State Department's Country and Religious Freedom Reports perform the work assigned to them by the majority. One would think from reading the majority's description of the reports that Pentecostals could live nowhere in Russia without facing a realistic risk of actual persecution. The majority presumably proffers such a description because the absence of such a country-wide hazard could by itself defeat Ivanov's asylum request. Tendean v. Gonzales, 503 F.3d 8, 11 (1st Cir. 2007) (asylum application will be denied "if it is shown by a preponderance of the evidence that '[t]he applicant could avoid future persecution by relocating to another part of the applicant's country . . . and under all the circumstances, it would be reasonable to expect the applicant to do so.'" (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)) (alteration in original)).

The 2006 Country Report, however, reports no acts of actual persecution of Pentecostals throughout all of Russia in the

previous year.  Even reports of lesser degrees of harassment of
Pentecostals decreased during 2006, following the appointment of
Pentecostal Bishop Sergey Ryakhovskiy to Russia's Public Chamber.[24]
United States Department of State, Bureau of Democracy, Human
Rights, and Labor, Country Report on Human Rights Practices in
Russia at 20 (Mar. 2007), available at http://www.state.gov/j/
drl/rls/hrrpt/2006/78835.htm [hereinafter 2006 Country Report].
These reports belie the notion that Ivanov, merely because he is
Pentecostal, cannot live in Russia without a risk of actual
persecution.

**B.    There Is Sufficient Evidence to Support the Finding of Fact
       That There Was an Insufficient Nexus between the Russian
       Government and the Abuse of Ivanov.**

        The law also requires that Ivanov prove that the persons
who persecuted him were "aligned with the government" or that the
government was "unwilling or unable to control [the violence.]"
Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir. 2009).  The
majority's conclusion that Ivanov made such a showing is based
partly on conjecture, appears to be the product of stereotypical
thinking about Russian law enforcement bereft of any sense of
context, and certainly fails to provide a compelling case for

---

        [24]  The Public Chamber was established to represent civil
society and to foster tolerance.  It was directed by President
Putin.  United States Department of State, Bureau of Democracy,
Human Rights, and Labor, International Religious Freedom Report for
Russia at 13 (Sept. 2006), available at http://www.state.gov/
j/drl/rls/irf/2006/71403.htm [hereinafter 2006 Religious Freedom
Report].

rejecting the contrary conclusion of the immigration judge, who found Ivanov's claims in this regard to rest on "speculation."

First, the majority implies that the kidnapping of Ivanov was aided by the police merely because the kidnapping occurred some uncertain number of days after the police told him that he would be sorry for refusing to accede to a police officer's demand that he provide incriminating testimony in an investigation of his pastor. I addressed this conjecture in Part A2 of this opinion.

Second, the majority cites excerpts from State Department reports recounting other incidents in Russia (a country of roughly 143 million people, 2006 Country Report at 1) where the authorities were, in the majority's words, "lackluster" in their responses to reports of religious attacks and that arrests were "extremely infrequent and convictions rare." 2006 Country Report at 20. The majority's use of such excerpts is selective, omitting, for example, the fact that the 2006 and 2007 Religious Freedom Reports describe in detail only a single incident, in a nation containing approximately 1,500 Pentecostal groups, 2006 Religious Freedom Report at 1, of violence against individual Pentecostals which could plausibly rise to the serious level of abuse sufficient to support an asylum claim. That incident was an attack by "youths" in early 2005 on Pentecostals holding a protest in Moscow. 2006 Country Report at 20. There is no indication in the record of whether this incident was investigated expeditiously. Id. There

are no reports of individual Evangelicals, or any Christians, suffering abuse comparable to that which Ivanov described being directed at him personally, let alone evidence that government officials acquiesced to such abuse.

The same report also states that in February of 1997 Russian authorities obtained the convictions of five skinheads for an anti-Semitic murder, and that "[f]ederal and regional officials participated actively in, and in many cases  strongly supported, a range of government and NGO-organized programs to promote tolerance."  United States Department of State, Bureau Democracy, Human Rights, and Labor, International Religious Freedom Report for Russia at 9 (Sept. 2007), available at http://www.state.gov/j/ drl/rls/irf/2007/90196.htm.  The same report further relates that in late 2006 a Russian court ruled in favor of the Pentecostal Church's ability to register its property, and the group reported no further harassment.  Id.

Third, the majority's heavy reliance on the fact that Ivanov was unaware of any investigations or arrests arising out of the crimes he described evidences a lack of perspective and context.  Certainly the failure of the police to interview Ivanov after he was released by his captors could support a finding that their investigation after the fact was lackluster.  On the other hand, the actual record is that the police told Ivanov's parents that they would look for him when his parents reported him missing.

The fact that they did not find him within two days in a city of over one million people, Library of Congress, <u>Russia: A Country Study</u> (1998), <u>available at</u> http://lcweb2.loc.gov/frd/cs/rutoc.html, hardly proves anything.  And the unstated assumption that Ivanov would have been aware of investigations concerning the other events he described is not compelling.  All in all, this is not a record that compels a finding that the police were aligned with the people who attacked Ivanov or unwilling or unable to do their jobs.

To put all of the foregoing in perspective and provide the context missing from the majority's discussion, one need only look at this country.  According to the October 1998 Report of the National Church Arson Task Force, in less than four years there were 670 arsons, bombings or attempted bombings of houses of worship in the United States.  National Church Arson Task Force, <u>Second Year Report for the President</u> (Oct. 1998), <u>available at</u> http://www.justice.gov/crt/church_arson/arson98.php.  Even in the wake of  a nationally coordinated investigative effort, arrests were made in connection with only 230 of the 670 incidents (a higher rate than typical for similar crimes, according to the Task Force).  <u>Id.</u>

I do not presume from these facts that churchgoers in the United States face persecution with government acquiescence.  To the contrary, if Ivanov cited these facts to suggest that he could not safely live in the United States without facing persecution, I

hope that we would reject such a suggestion. And when we have a record reporting no higher rates of bombing or unsolved bombings in Russia, and an unsolved incident of abuse of a drug rehab worker by drug dealers in Chelyabinsk (a city of more than 1 million people), I do not see why an immigration judge cannot find as a matter of fact that Ivanov does not face the requisite risk of government related persecution should he return to Russia.

Of course, I am now arguing the weight of the facts, which I need not do. All I need show is that the facts are not so hefty and one-sided as to compel the conclusion that they must be weighed as the majority weighs them.

## C.  Conclusion

At base, the majority appears to act on a conviction that if many so-called skinheads possess a strong animus against Pentecostals as manifest in prior acts of harassment and abuse, and Pentecostals operate a rehab center for religious reasons using religious methods, then any skinheads' later abuse of operators of that center must necessarily be, at least in part, on account of the skinheads' religious animus. I fear that such a conviction under-appreciates the complexities of human behavior, and substitutes stereotypical thinking for allegiance to the actual facts as described by Ivanov himself. Similarly, the majority fills holes in Ivanov's case with conjecture about what the police did and did not do, all resting in part on what seems to be an

unrealistic assumption about the aims and efficiency of police work in Russia.  More importantly, even accepting that conviction as plausible, on this record it is not so compelling as to overbear the deference due to the amply supported findings of fact by an immigration judge who decided that Ivanov could practice his faith in Russia without persecution on account of that faith.  I must therefore conclude that, notwithstanding our shared sympathy for Ivanov's desire to remain in this country, the record contains substantial enough evidence to require that we defer to the findings of the immigration judge.